## NOMATH HOTEL COMPANY v. KANSAS CITY GAS COMPANY, Appellant.

### Division One, July 31, 1923.

1. **FAILURE TO PLEAD:** Waiver. Going to trial without objection after the filing of an amended petition is a waiver of defendant's failure to file an amended answer thereto, and is equivalent to a refiling of the original answer.

2. **PRACTICE:** Case for Jury. Where plaintiff's evidence makes out a prima-facie case for him, the jury should be permitted to pass upon it under the guide of proper instructions .

Nomath Hotel Company v. Gas Company.

3. **NEGLIGENCE: Gas Explosion: Instruction: Other Possible Causes.** In an action for damages to plaintiff's building caused by an explosion alleged to have been caused by defendant's negligence in permitting natural gas to escape from its pipes into his restaurant, an instruction telling the jury that if they believe from the evidence that the explosion "might have been caused by natural gas escaping into plaintiff's basement from his own house pipes, gas stoves or fixtures," though the gas may never have escaped from the house pipes, stoves or fixtures, was clearly erroneous; and plaintiff having made out a prima-facie case for the jury, to the effect that the escape of the gas was due to leakage in defendant's pipes, negligently permitted, the court, having given such instruction and the verdict being for defendant, properly granted a new trial. The jury should have been instructed that the plaintiff could not recover unless they found from the evidence that the gas which caused the explosion actually escaped from defendant's pipes, and in determining that question they had a right to take into consideration the reasonable probabilities of all facts shown by the evidence.

4. ———: ———: ———: **Proof to a Certainty: Reasonable Preponderance.** An instruction in a civil action which requires the plaintiff to prove his case to a degree of certainty is erroneous. An instruction which tells the jury that a verdict for plaintiff "must be based upon credible and reasonable, reliable and certain evidence" is erroneous. It is not necessary that the minds of the jury be free from all doubt; it is their duty to decide for the party on whose side the weight of the evidence preponderates.

5. ———: ———: **Contributory: No Notice to Defendant of Leak.** Where there is no evidence tending to show that the plaintiff knew that gas from defendant's pipes was leaking into his premises, he was not guilty of contributory negligence in not notifying defendant of such leakage.

Appeal from Clay Circuit Court.—*Hon. Ralph Hughes,* Judge.

AFFIRMED.

*James Simrall* and *Charles M. Miller* for appellant; *J. W. Dana* of counsel.

(1) The trial court erred in granting plaintiff a new trial for the reason that it erred in giving Instructions 9

and 16 requested on behalf of the defendant. Louisville Ry. Co. v. Wellington, 126 S. W. 371; Nelson v. Mining Co., 88 Pac. 786. (2) The trial court erred in granting a new trial to plaintiff for the reason that plaintiff made no case of actionable negligence for a jury against defendant, and the court should have given defendant's peremptory instructions, and the verdict, therefore, being for the right party it, is immaterial whether or not there was any error, in the giving of instructions. (a) No actionable negligence was proven by plaintiff against defendant. Sipple v. Gas Light Co., 125 Mo. App. 81; Nomath Hotel Co. v. Gas Co., 204 Mo. App. 214; Woodburn v. Heat & Power Co., 164 Ky. 30; Quass v. Gas Light Co., 170 N. W. 942; Hammerschmidt v. Gas Co., 99 N. Y. Supp. 890; Mowers v. Gas Co., 126 N. Y. Supp. 1033; 14 Am. & Eng. Ency. Law, 937; State v. Gas Co., 85 Md. 637; Hunt v. Lowell Gas Co., 1 Allen, 343; Bartlett v. Boston Gas Co., 117 Mass. 539; Holly v. Boston Gas Co., 8 Gray (Mass.) 123; Emerson v. Lowell Gas Co., 3 Allen, 410; Rockford Gas Co. v. Ernst, 68 Ill. App. 330; Aurora Gas Co. v. Bishop, 81 Ill. App. 493; Pine Bluff Water Co. v. Screider, 62 Ark. 109. (b) The cause of the explosion was a leak in plaintiff's house piping, which includes the booster pump, over which defendant had no control. (c) The booster pump was unlawful. Green Co. v. Kansas City, 240 S. W. 132; Thornton on Oil and Gas (3 Ed.) sec. 31; Manufacturers Co. v. Indiana Co., 155 Ind. 461; Kansas City Gas Co. v. Kansas City, 198 Fed. 519; State ex rel. v. Kansas City Gas Co., 254 Mo. 533; The Lusitania, 251 Fed. 732; Barney v. Railroad, 126 Mo. 372; Williams v. St. Joseph, 166 Mo. App. 300. And was not only the cause of the ignition of the gas, but was, in another respect, at least a direct contributing cause of the result and damage to plaintiff by reason of leaking gas from the house piping including the booster pump, and forcing an unusual and great volume of additional gas into plaintiff's cafe, in either event barring recovery. Swizart v. Lusk, 196 Mo.

App. 476; Weller v. Railroad, 120 Mo. 656; Williams v. Friese, 14 Mo. App. 436; Roper v. Greenspon, 272 Mo. 288; Taxicab Co. v. Stroh, 215 S. W. 748.

*Cooper, Neel & Wright* and *Martin Lawson* for respondent.

(1) The court was clearly justified in granting plaintiff a new trial for the reason assigned, viz.: that prejudical error was committed in giving Instructions 9 and 16 requested on behalf of defendant. Instruction 9 told the jury to find for defendant if it considered possible of occurrence any of certain facts which defendant advanced as alternative explanations of the explosion. This elevated plaintiff's burden of proof to the degree required in criminal cases—that it must have proved its theory of the explosion beyond a reasonable doubt. Instruction 16 emphasized this unreasonably high standard, by requiring plaintiff to furnish proof amounting to "certain" evidence, and Instruction 8 clinched the matter with the jury by charging them that they must find for defendant if the evidence was "uncertain." The whole evidence, for both plaintiff and defendant, was circumstantial. In the nature of the case, an honest jury could not reach a conviction which excluded every reasonable doubt. Circumstantial proof does not establish the ultimate fact to a certainty, nor is the plaintiff in any civil case required to prove his case by more than a reasonable preponderance of the credible evidence. No plaintiff is compelled to show that a casual theory advanced by defendant could not possibly be true, but only that the strong probability is otherwise. (a) All Missouri precedents condemn these instructions. State ex rel. Detroit Ins. Co. v. Ellison, 268 Mo. 239; First Marine Ins. Co. v. Lusk, 205 Mo. App. 205; Gay v. Gillilan, 92 Mo. 257; Grant v. Rowe, 83 Mo. App. 562; Williams v. Watson, 34 Mo. 95; Culbertson v. Hill, 87 Mo. 553; Scott v. Allenbaugh, 50 Mo. App. 130; Bitter v. Sauthoff, 98 Ill. 266; Thomp-

son Lumber Co. v. Interstate Comm. Comm., 193 Fed. 682; Stearns v. Field, 90 N. Y. 640; Graves v. Caldwell, 90 Ill. 618; Hister v. Laird, 1 W. & S. (Pa.) 245; Ratner v. Sadowsky, 156 N. Y. Supp. 292; Callison v. Smith, 20 Kan. 28; Ball v. Marquis, 92 N. W. 691; Kelly v. Malhoit, 115 Ill. App. 23. With respect to the construction of the word "certain," see Treadwell v. Whittier, 80 Cal. 574, 5 L. R. A. 498. (b) Error is not cured by other instructions. Goode v. Central Coal Co., 167 Mo. App. 169; Walker v. White, 192 Mo. App. 13. (2) The trial court properly refused defendant's peremptory instructions. Tacitly recognizing the prejudicial error of the instructions heretofore discussed, appellant's counsel devote most of their brief to the contention that plaintiff failed to make a case at all and so the court should have directed a verdict for defendant. On the previous appeal, the Kansas City Court of Appeals held exactly to the contrary. Nomath Hotel Co. v. Gas Co., 204 Mo. App. 214. A much stronger case was made by plaintiff on the second trial, and this court has before it considerably more proof to sustain plaintiff's claim. Defendant misstates the effect of that decision. It did not deny but affirmed plaintiff's right of recovery. The reversal and remander was to permit introduction of the evidence about a previous fire at the Kansas City Club excavation, which was in the record, but had been withheld from the jury at the first trial because the allegations in the petition were considered too narrow. That decision is conclusive of defendant's liability. The question is *res judicata*. Choteau v. Gibson, 76 Mo. 38; Melvin v. Hoffman, 235 S. W. 107. (a) At the trial, notwithstanding that the evidence indisputably fixed natural gas as the cause of the explosion, defendant's counsel advanced theories of sewer gas, furniture polish and gasoline vapor as possible agencies. But in their brief they now abandon these other theories and affirmatively assert that their natural gas produced the explosion. (b) Defendant's effort to show that the gas escaped from a leak in one

of plaintiff's house pipes or appliances was based on mere suspicion and was quickly dissipated by the proven facts. (c)  The location of the explosion negatives any possibility of its having been caused by gas escaping from the service pipe at the range.  (d)  Plaintiff made a complete and convincing case of circumstantial evidence. Harshmann v. Gas Co., 83 Kan. 329; Nash v. Gas Co., 234 S. W. 360; Taylor v. Gas Co., 185 Mo. App. 537.

WOODSON, J.—This suit was instituted in the Circuit Court of Jackson County by the plaintiff against the defendant to recover $12,500 damages sustained, caused by the alleged negligence of the defendant in permitting natural gas to escape from its pipes and into the basement of plaintiff's premises, which contained a restaurant known as the Pennant Cafe, which, in the transactions of the ordinary business of the cafe in the ordinary way, exploded and caused the damages sued for.

The trial resulted in a verdict and judgment for the defendant, and a motion for a new trial having been filed the court sustained the same for the reasons stated, that it had erred in giving defendant's instructions numbered 9 and 16, from which action of the court in sustaining said motion the defendant duly appealed the cause to this court.

The negligence charged in the second amended petition is in this language:

".  .  .  negligently and carelessly caused and permitted a large quantity of natural gas to escape from the Baltimore Avenue and Thirteenth Street mains aforesaid at points within a radius of 400 feet from plaintiff's basements and also from the gas main, valve and valve box, pipes, piping and other conduits, so owned, operated and maintained by defendant in and under the east side of Baltimore Avenue aforesaid adjacent to the premises so occupied by the plaintiff, and to leak and seep from defendant's said mains, valve and valve box,

pipes and pipe lines, through and into and around the said water pipes, valve, valve box and fire hydrant and thence through and around said water drain or waste pipe into plaintiff's basement, and also through the walls and foundations of said seven-story buildings in various places, so that such natural gas accumulated in the basement rooms so occupied by plaintiff, and particularly in said linen store room and office room, in sufficient quantities and so mixed with the air in said room as to be combustible and explosive.''

The answer of the defendant to the first amended petition of the plaintiff in substance was:

First: A general denial.

Second: A plea of contributory negligence.

Third: Plaintiff negligently, and unlawfully, and in violation of Ordinance No. 8690 of Kansas City, Missouri, installed into its basement a gas pump or booster, and connected the same with the pipes of the defendant, and on account of that negligence and unlawfulness the gas, if any, was caused to escape from said pipes or pump, and was ignited by sparks generated from said pump or booster, and thereby caused the explosion.

Fourth: That by reason of said negligence and unlawful conduct of the plaintiff in installing said gas pump or booster, the plaintiff unlawfully and wrongfully drew from the pipes more than its proportional part of the natural gas that was being furnished to the customers of Kansas City and thereby contributed to its own injury.

Fifth: That if any gas leaked into the plaintiff's basement, the latter knew, or by the exercise of ordinary care could have detected, that fact, and that it was his duty under a contract with the defendant to have notified the defendant of such leakage in writing as soon as so discovered, and had it done so, the defendant could have stopped same in time to have prevented the explosion, and the plaintiff having so neglected to notify the defendant of such leakage, it was guilty of contributory negligence.

The reply put in issue all the new matter stated in the answer.

I have examined the record carefully, and have failed to find that the defendant filed a second amended answer to the second amended petition, at least it is not so indexed that I could find it, and since the trial proceeded without it, I naturally presume the parties went to trial without it, which conduct of theirs is equivalent to refiling the first amended answer.

The plaintiff's evidence tended to show that a terrific explosion of natural gas occurred in plaintiff's basement at 1211 and 1213 Baltimore Avenue, Kansas City, Missouri, and the plaintiff sustained substantial damages to its property by reason thereof. The case was previously tried and the verdict was for plaintiff and was appealed to the Kansas City Court of Appeals which court reversed and remanded the cause for a new trial, with leave for the plaintiff to file a second amended petition, which was done, and which contained the charges of negligence previously quoted. That case is reported in the 204 Mo. App. 214, to which reference is here made.

Baltimore Avenue runs north and south, and the basement, which is on the east side thereof, began under the sidewalk curb line, and, with a frontage width of forty feet, ran back east to an alley. The basement was divided into three rooms: one, called the office room, used also for linen and storage purposes, about 8 by 20 feet, was in the southwest corner under the sidewalk; another, called the service bar room, was immediately north of the office room, also under the sidewalk; and the third, which was the kitchen of plaintiff's cafe, occupied the entire remainder of the basement, extending from said two small rooms east about ninety feet to the alley.

The explosion occurred in the office room which was enclosed on the west, north and south sides by eighteen-inch concrete foundation walls, the false ceiling under the concrete sidewalk being composed of three-inch con-

crete slabs containing heavy art-glass skylights, and the only fragile wall being a light terracotta partition on the east side of the room.

The explosion blew out parts of the false ceiling and sidewalk above, lifting up and breaking the sidewalk and concrete slabs, and, following the course of least resistance, took an eastward direction with such force that it tore out the east terracotta wall and wrecked everything in its pathway into and half way through the deep kitchen room, killing an employee; and the force of the explosion was so great that a one-and-a-half-ton refrigeration box was thrown over and partially wrecked. The solid masonry on all three other sides of the office so directed the course of the explosion due eastward through the light partition wall. The evidences of the fire which followed the explosion were more on the west than east side of this office room, and at or near the ceiling.

The office room contained no windows, transoms, or other means of ventilation, and had been closed, practically the first time in the cafe's history, for two days. It contained no gas pipes of any kind, and a waste water drain in the floor at one corner was in good working order and equipped with a device which prevented any sewer gas from coming up into the room.

The gas service pipe supplying gas to the cafe entered the basement through the adjoining service bar-room on the north. This room contained also the gas meter and a gas booster pump used by the plaintiff. From this room the gas service pipe proceeded directly into the kitchen and was entirely outside of the office room. Between this service bar-room and the office room where the explosion occurred, was the eighteen-inch concrete foundation wall, supplemented by a four-inch tile partition, making in all a twenty-two-inch wall.

Immediately following the explosion, on the same day, an investigation was begun by all persons interested. It was inaugurated and paid for jointly by Kling & Allen, owners of the building, J. B. Bray, the proprietor

of the Hotel Dixon, located upstairs, and plaintiff. The investigation was participated in by the city fire department, Ivan O. Rapier, engineer of the building, R. H. Sanneman, the architect who designed and superintended construction of the building, Ben Tilleson, the plumber who installed all piping, drains and plumbing, and also representatives of defendant, the gas company. All the gas service pipes in the entire basement were gone over carefully and found not to be leaking. The gas meter and gas booster pump were also intact, without leakage at any point. Every conceivable agency which might have produced such an explosion was considered and investigated, including, besides natural gas, sewer gas and two others suggested by defendant's representatives, furniture polish and gasoline vapor, and all except natural gas were conclusively eliminated by careful tests, the surrounding physical conditions and the application of scientific laws. The facts ascertained with respect to these other suggested agencies, although fully shown in the abstract of record, are omitted from this statement, because appellant has now abandoned all such claims and affirmatively contends in its brief that the explosion was caused by natural gas.

Two days later, on April 2nd, a further investigation was made which was participated in by other experts, Herman Henrici, a consulting engineer and chemist, Dr. Roy Cross, a chemist, together with the experts who had made the first examination of the premises, and again representatives of the gas company. This investigation by the experts named was also at the instance of all parties interested and paid for by them, plaintiff contributing only its proportionate share of the expense. Again the gas service pipes were found intact and in good condition. But this investigation disclosed that the gas and water mains running north and south under the street in Baltimore Avenue, were in close proximity, only ten inches apart, and eight feet from the curb line, where the west wall of the office room was located; that a fire

water hydrant was installed in the sidewalk just above this room, and its overflow was drained by a water waste pipe which ran down into the office room from the hydrant and terminated with an open end a few inches above the floor; that there was a valve box in the street, connected with the hydrant, and the gas service main to plaintiff's premises ran from the street main past and near the said valve box and hydrant, into the service bar-room aforesaid; that a water service main to which the valve box was attached, five feet and eleven inches from the curb line, ran parallel to and lower than the gas service pipe, to the fire hydrant; that a heavy asphalt street pavement, with a concrete base, lay above all these pipes and hermetically sealed everything below it; that solid limestone rock lay underneath the street and building, except for trenches which had been dug out for the mains and pipes aforesaid; that these trenches were filled with porous soil consisting of loose clay, earth and broken rock; and that just outside of the building wall enclosing the office room, under the street pavement, there was a cavity large enough for a man to crawl into. This cavity was wedged-shaped, opening upwards toward the street pavement, and was part of a larger hole under the street, made by the excavation for the seven-story building, the remainder being filled with porous earth and broken rock. Plaintiff's Exhibit 7, on file by stipulation with the clerk, will graphically show all these physical conditions with reference to the relative locations of the mains, pipes, hydrant and west wall of the office room, and the character of the surrounding soil. It was discovered and demonstrated by flushing the hydrant, that all of the waste water did not go through the hydrant drain pipe, but much of it seeped through the west wall of the office room when the hydrant overflowed. This west wall was cracked, and the plaster stained by water which had seeped through from time to time. Plaintiff's photographic exhibits 1, 2, 3 and others show these conditions, which were described at the trial by the archi-

tect. The gas company made a small excavation in the street immediately outside of the office room, exposing a small portion of the gas main and service pipe connection, and the water valve box was also opened up. Plaintiff's expert witnesses smelled a strong odor of natural gas, both around the service main and the service pipe before it reached plaintiff's premises, and also in the water valve box. Defendant's street gas main on Baltimore Avenue runs southward beyond 13th Street, is laid in a trench surrounded by solid rock filled with the same character of porous earth and broken rock which was under the street outside plaintiff's premises. The street has an up-grade of about five per cent from 13th Street running northward to 12th Street, and the evidence showed that natural gas, which originates in ground of this character, readily travels through it for miles, in some cases, and will seep through any soil except solid rock; that it follows the course of least resistance and being lighter than air, such gas has a tendency to rise and travel upward, and will naturally follow the course of the gas pipes and main in trenches of this character surrounded by solid rock; and when lateral pipes are encountered in similar trenches, will follow them also; that natural gas will go wherever water does, will seep through concrete walls and that under an hermetically sealed asphalt pavement, such as Baltimore Avenue, the pressure would force the gas downward and through the wall of plaintiff's office room in the same manner that water seeped through it, and also through the water drain pipe.

Natural gas is almost odorless, being detectible through smell only by persons trained and accustomed to it. This accounted for plaintiff's lack of knowledge of the presence of the gas, its employees having smelled none previous to the explosion. It is highly inflammable and explosive, being easily ignited by a spark or other fire and cannot be exploded by any other agency. When ignited, natural gas makes a bluish flame such as witness

Enderman observed, and when the gas is mixed with air in explosive proportions, combustion follows ignition.

It appeared that witness Tilleson, who installed the plumbing in plaintiff's basement premises, had, several months before, smelled natural gas seeping through the west wall of this office room, from the street. And the evidence showed that for several months prior to the explosion heavy blasting with dynamite had been carried on continuously in the excavation at the site of the new Kansas City Club building at the northwest corner of 13th Street and Baltimore Avenue, only one hundred and twenty-five feet distant from plaintiff's basement; that this blasting was so violent in character as to rock the whole building in which plaintiff's basement was located; that the blasting caused vibration also of the earth adjacent to and underneath said building, producing loud reports, and such concussion that persons on plaintiff's premises felt the building tremble. These effects of the blasting were testified to by many witnesses, all disinterested, including engineer Rapier, plumber Tilleson and architect Sanneman, and were wholly undisputed by defendant. Defendant knew of the excavation work, and blasting being openly and publicly done at the Kansas City Club site.

Defendants gas main was built of cast-iron pipes twelve feet long, fitted together and sealed with yarn, around which lead was poured and the joints then corked. Blasting, such as occurred at the Kansas City Club site, causes vibration of the ground over an area of two hundred feet, and would break or loosen gas pipes, causing escape of gas therefrom, at any point in such area. Its possible effect on the gas mains was admitted by defendant's inspector with thirty-four years' experience and service with the company. He and others testifying for defendant also conceded the tendency of escaped gas under such conditions, to follow the company's pipes and mains in the manner plaintiff claimed.

At least one fire had previously occurred as the result of leakage of gas from defendant's mains around

13th Street and Baltimore Avenue during this blasting. The chief of the fire department, in explanation of the cause, testified that "gas was burning from a broken main." All witnesses attributed this leak and fire to the excavating work, either from direct vibration of the blasting or else from this vibration coupled with under-mining of the street resulting therefrom. Pursuant to its custom of sending representatives to every fire, the gas company sent men to this one, which occurred February 16, 1918, or six weeks before the explosion. This break in the main was not due to the steam shovel used in excavation, as it appeared at the time of the breakage that the excavation for the Kansas City Club was from twenty to thirty feet deep and the shovel was being used at the bottom of the excavation; that defendant's main was laid only four feet below the surface of the street and the fire broke out at a point about three feet from the surface, while a wide stratum of solid rock intervened for fourteen feet of the distance between the point of breakage of the main and the bottom of the excavation. The existence of this rock foundation also showed that blasting vibration, rather than undermining resulting from excavation, had broken the pipe. And such intervening rock, coupled with the distance from the then location of the steam excavating shovel at the bottom of the excavation, removed any possibility of its having broken the pipe by contact—an unsupported suggestion of defendant's counsel. This fire showed the effect of the blasting on defendant's near-by mains, and was notice thereof to defendant three weeks before the explosion.

There was no other source of natural gas in the vicinity than defendant's mains. Defendant had two mains then in operation on 13th Street—one large twelve-inch pipe and the other a four-inch pipe, and a six-inch main under Baltimore Avenue. The Baltimore Avenue main was more than fifteen years old, and the large 13th Street main thirteen years old. The connections and connecting service pipes are comparatively short-lived.

No inspection of defendant's Baltimore Avenue main or connecting service pipes was made by defendant prior to the explosion, and none of the 13th Street mains, except of the portion broken at the time of the February 16th fire, although there were several methods available to and ordinarily used by defendant to ascertain leaks, one by so-called leak-lamps inserted in the stop or valve boxes (one valve box being just outside plaintiff's basement) or lowered into a hole perforated with a small rod into the basement, another by extracting a sample of gas for analysis from such a perforated hole, and another by examining the manholes at the street corners. A still further method of inspection is by attaching to the gas pipe a mercury or test pump. Each of these methods readily disclose the presence of gas and approximate place of leakage. It appeared by defendant's own witnesses that the gas company ordinarily made inspections to determine leaks even in the absence of any complaints, "where they felt possibly there might be some trouble," but it was wholly neglected in this instance.

At the investigations aforesaid, the experts gave careful consideration to, but were forced to reject, various alternative theories suggested by the gas company's representatives, including one now relied upon—that strikers might have disconnected the service pipe leading to the gas range in defendant's kitchen. This was suggested by the co-incidental facts that plaintiff's cafe was then closed, that a strike of the employees of laundries was in progress, and that, immediately preceding the explosion, the gas booster pump had been put in operation and an effort made to light the gas range, which failed for lack of gas therein, But the evidence refuted any possibility of unlawful acts on the part of anyone. Plaintiff's restaurant was closed merely because of inability to get laundry work done and food supplies. Plaintiff then and previously, had no labor troubles whatever, paying full wages and requiring the minimum hours demanded by the union. All witnesses agreed

that plaintiff's employees had not reason or disposition
to strike and "felt that he [the manager] was treating
them fairer than anyone else in town." The only sem-
blance of a labor situation developed by defendant was to
show that all cooks and waiters belonging to unions had
been directed to join in a sympathetic walk-out on ac-
count of the laundry strike, but their relations with
and feeling toward plaintiff as their employer were
"perfectly fine" and "exceedingly friendly" with "ab-
solutely no trouble whatever," and it was against the
wishes of the employees even to join in this sympathetic
walk-out, the only demand for increase in wages which
they had ever made having been instantly complied
with. Plaintiff's employees were never on a strike.
Moreover, the disconnection of the service pipe at the
range resulted from the range being moved by the ex-
plosion, being a "broken-feed line," and giving no ap-
pearance of having been tampered with. This range was
located in the kitchen proper, an entirely separate room
from the office in which the explosion occurred, and at
considerable distance therefrom; and the office room
was closed, the transomless door being shut during the
three or four minutes time that the gas pump was in
operation on the morning of the explosion; these facts
demonstrated that gas could not have traveled clear
from the range and could not have entered the office
room. Even more important, it appeared that the chief,
Sereno Benedito, struck matches, trying to light the
coffee urn at the range, which would certainly have ig-
nited any gas escaping from a disjoined connection there.
From that cause, the explosion would necessarily have
occurred when he lit the match and in the kitchen where
he lit it, instead of in the office room. The kitchen base-
ment was equipped with a first class ventilating shaft
and system in good working order, which would probably
have carried off escaping gas even without its fan being
in operation. It was clearly explained that the running
of the booster pump would not necessarily produce gas

at the range, as a "shut-off valve" near the end of the pipe leading to the range was closed, preventing escapage of gas from this pipe and also the lighting of the range. This evident improbability was admitted by defendant's witnesses. There were also other valves at both ends of the branch pipe on which the gas booster pump was installed, likewise shut off, which prevented the pump leaking any gas or forcing gas through this service pipe. And the pump was equipped with a pressure relief valve which took care of any excess gas. The closed shut-off valve near the range end of the service pipe showed why the range did not light, and the safety pressure valve together with the shut-off valves surrounding the pump disposed of defendant's theory of gas leaking from the pump itself. And this pump was located in the service bar room separated by a solid 22 inch wall from the office room where the explosion occurred, the closed door to the office room also preventing any inlet of gas from this pump.

Samples of air contents taken from the excavation in the streets surrounding defendant's main and the other valve box, were analyzed by chemist Dr. Cross, but his testimony showing same to contain natural gas in explosive proportions was excluded by the court.

The use and installation by plaintiff of a gas booster pump was relied on as contributory negligence. But the evidence disclosed that this pump could not have been a factor causing or contributing to the cause of the explosion, being located in a different room and on the other side of a sealed twenty-two-inch wall, and the pipe to which the pump was attached being shut off by valves so as not to carry or emit gas, and being likewise entirely outside of the office room. With reference to the pump itself, and the motor and switch box with which it was equipped, the evidence showed that the switch box was of the customary, approved type of installation; that all such boxes spark when they are turned on and off; that the pump was one of the best kind made; that such

pumps were in common use, and that this was generally known, being a matter of frequent comment in newspapers; that plaintiff had to use such a pump on account of low gas pressure, in order to get enough gas to operate its kitchen; that representatives of the defendant gas company were present when the gas pump was installed and showed plaintiff how to connect it; that the city plumbing inspector knew of the use of such pump by practically every hotel and restaurant, and knew that such pump would be attached by plaintiff after his inspection. This was known also by the city gas inspector and the turn-on man for the gas company, who told plaintiff's plumber that he would have to connect the pump after their inspection and after the gas was turned on. At the time of the inspection by the city plumbing and gas inspectors, the gas pump was already installed and merely not connected up. There was no ordinance or statute prohibiting such gas booster pumps. Section 25 of the general plumbing ordinance merely gave the city plumbing and gas inspector free right of inspection and to make certain requirements for public health and safety, and under Section 5 of this ordinance he had the positive duty to report violations, but actually promulgated no rules or orders against the use or maintenance of such pumps. He, like all the other authorities, made no effort to prohibit gas pumps, but permitted them and plainly did not consider them as illegal.

Plaintiff had no prior knowledge of the leakage of gas into the office room, and the leak detected by the plumber some three months before the explosion was not reported to plaintiff.

Instructions numbered 9 and 16 before referred to, are as follows:

"9. If the jury believes from the evidence that the explosion, complained of by the plaintiff, might have been caused by natural gas escaping into plaintiff's basement from its own house pipes, gas stoves or fixtures in said basement, either prior to or at the time of the opera-

300 Mo.—17

tion of the gas pump shown in evidence at the time of or immediately before said explosion, they will find a verdict for the defendant.''

''16.   The court instructs the jury that the burden of proof is upon the plaintiff to prove its case by a reasonable preponderance of all the credible evidence, and if the plaintiff has not done so, or if the evidence is evenly balanced, then your verdict must be for the defendant; and the court further instructs you that you cannot base a verdict for the plaintiff upon speculation or conjecture, but it must be based upon credible and reasonable, reliable and certain evidence.''

I.   Counsel for appellant contend that this evidence did not make a prima-facie case for the jury.
**Prima-Facie Case.**  We think unquestionably it did, and that the trial court properly overruled the demurrer.

II.   The foregoing statement of the facts has been taken largely from the statement of the case made by counsel for respondent, which was done after an elaborate examination of the printed abstract of the record of the case, which is almost 700 pages in length, and since counsel for appellant points out no inaccuracy in the statement, I feel quite confident that it is approximately true, even though it may be conceded the evidence introduced by the appellant may have tended strongly to have established a good defense to the respondent's case.

And as previously stated, the evidence introduced by the respondent made a prima-facie case for the jury, and they should have been permitted to have passed upon it under proper instructions, which was not done in the trial.

Instruction 9 given for respondent complained of was clearly erroneous for the reason it barred the plaintiff's right to a recovery, if the jury believed from the evidence that the explosion complained of *might have*

Instruction. *been caused* (italics ours) by natural gas which escaped into plaintiff's basement from its own house pipes, gas stoves, or other fixtures, and that, too, even though the gas may never have escaped from those pipes, stoves or fixtures.

The jury should have been instructed that the plaintiff could not recover unless they found from the evidence that the gas which caused the explosion actually escaped from the pipes or fixtures of the appellant's company, and in determining that fact the jury should have been told that they had the right to Possible and Probable Cause. take into consideration the reasonable probabilities of all the facts as shown by the evidence, and should not have barred a recovery by telling them that they could not find for it, if they believed from the evidence that the gas *might* have escaped from plaintiff's own pipes, stoves, etc.

In discussing a similar question the Court of Appeals in the case of Fire & Marine Ins. Co. v. Lusk, 205 Mo. App. l. c. 205, used this language:

"And in so determining this ultimate issue of fact, the jury may rightfully adopt the hypothesis that the fire was communicated by a spark or sparks from defendant's engine, even though the evidence adduced in support thereof is not such as to entirely negative every other hypothesis as to the origin of the fire."

At the same page, in the same opinion, the court said:

"It is true that it is the duty of the jury to determine the ultimate issue of fact, viz., whether the fire did or did not originate as alleged in the petition. And in order to return a verdict for plaintiff, the jury must believe and find that the fire was in fact set out by a spark or sparks from defendant's engine.

"But in order for them to so find, it is not necessary that there be direct and positive evidence that the fire so originated; on the contrary, the jury may make such finding upon all of the facts and circumstances in the

case as shown by the circumstantial evidence adduced. And between two hypotheses, appearing from such evidence, the jury may choose that which in their judgment is the more reasonable and probable, and, by adopting that hypothesis, say by their verdict that the fire did or did not originate in the manner alleged in the petition.''

And in the case of Gay v. Gillilan, 92 Mo. 250, l. c. 257, SHERWOOD, J., used this language:

''In civil cases 'it is not necessary that the minds of the jurors be freed from all doubt; it is their duty to decide in favor of the party on whose side the weight of the evidence preponderates,' and according to the reasonable probability of truth.'' In such cases, 'it is sufficient if the evidence on the whole agrees with and supports the hypothesis which it is adduced to prove; but in criminal cases, it must exclude every other hypothesis but that of the guilt of the party.' ''

Later, in Long v. Martin, 152 Mo. l. c. 683, the language since repeatedly approved by this court, was used:

''But in a civil suit, where it would be as wrong to make a mistake against one as against the other party, the only just rule is to weigh the evidence with the best light the law can give us, and decide according to its fair preponderance.''

BOND, J., well commented, in Grant v. Rowe, 83 Mo. App. page 564:

''It is not essential to credence of facts, or what is the same thing, that the mind should be satisfied as to their existence, that we should be able to banish all doubts on the subject. We are conscious of some doubts as to many of our convictions on the most important affairs of life. The pertinent question is, would not opposite conclusions be obstructed by greater and more insoluble doubts? If so it would be irrational to accept them. The mental state which a juror in a civil action should be instructed to endeavor to reach is, not that arrived at when all doubts have been dispelled, but it is that state of reasonable certainty—and hence mental

satisfaction—as to his findings, which results in the mind of the trier of facts after he has given full consideration to all the relevant evidence and made a free comparison and impartial weighing of all opposing doubts and uncertainties arising from the proof.''

III.  Instruction numbered 16 given for the defendant was equally erroneous. ' It required the plaintiff to prove its case by evidence which arose to a degree of certainty.  Such is not the law. The law only requires the plaintiff to prove his case by a preponderance of the evidence, which means that the evidence must reasonably satisfy the minds of the jury that the plaintiff has proved the facts of his case, as charged in the petition, and if they so find them, their verdict should be for the plaintiff, even though they should have some doubt as to the real facts of the case.

*Certainty.*

IV.  The record fails to show that the plaintiff installed a gas pump or booster in the basement of its building, in violation of an ordinance of Kansas City, Missouri, or at least I have been unable to find the ordinance pleaded, in the record, nor had the appellant indexed the same so I could find it; moreover, counsel state in their statement of the case that no such ordinance existed, which statement is not denied by counsel for appellant, and we are therefore unable to say that the respondent was guilty of contributory negligence as a matter of law for having placed the pump in the basement of its building.

*Ordinance.*

V.  There was no evidence introduced tending to show that the respondent had notice or knowledge that the gas was leaking into plaintiff's basement, and therefore the respondent was not guilty of contributory negligence in not notifying the appellant of such leakage.

*Notice of Leakage.*

VI.    Because of the errors before mentioned, we are of the opinion that the trial court properly granted a new trial, and therefore the judgment granting the re-hearing is sustained, and the cause remanded to the circuit court for another trial.    All concur.