Bradley R. CHRISTIE and Stella M. Christie, Respondents,

v.

GAS SERVICE COMPANY, a Corporation, Appellant.

No. 48121.

Supreme Court of Missouri,

Division No. 1.

May 8, 1961.

Motion for Rehearing or to Transfer to Court en Banc Denied June 12, 1961.

Francis Smith and W. H. Utz, Jr., of Smith, Sherwood, Utz & Litvak, St. Joseph, for defendant-appellant, The Gas Service Co.

Lewis W. Sanders, Sanders & Niewald, Kansas City, John E. Downs, Downs & Pierce, St. Joseph, for respondents.

HOUSER, Commissioner.

Action for property damages brought by the owners of a filling station against a supplier of natural gas, charging negligence in the installation of gas supply facilities and failure to discover and repair a gas leak, resulting in two fires and an explosion. Bradley and Stella Christie, the property owners, sued the supplier, Gas Service Company, joining Land Construction Company as co-defendant on the theory that Land negligently caused its excavating machinery to unearth and break an underground gas pipe located in the filling station driveway, thereby causing the fires and explosion. Plaintiffs dismissed as to Land at the close of all the evidence. The jury returned a verdict for plaintiffs and against the gas company for $23,650. The gas company has appealed from the judgment entered on the verdict.

■ The gas company's first point is error in not directing a verdict in its favor at the close of the evidence for failure of plaintiffs to prove that the fires and explosion were caused by negligence on its part, and for the reason that plaintiffs were guilty of contributory negligence as a matter of law. We consider only the evidence most favorable to plaintiffs and inferences to be drawn therefrom, and the evidence of the defendants will be disregarded unless it aids plaintiffs' case against the gas company. Stephens v. Kansas City Gas Co., 354 Mo. 835, 191 S.W.2d 601. In 1939 plaintiffs were leasing a business property located in the northwest corner of the intersection of Belt Highway (north and south) and U. S. Highway No. 36 (east and west) in Buchanan County. On the north end of the property there was a drive-in restaurant; on the south end, a gasoline filling station. The area surrounding the buildings was gravelled. The southeast corner of the area located in the angle formed by the north line of Highway No. 36 and the west line of Belt Highway, a triangular-shaped tract, was part of the right of way of the state highway department. By

agreement that portion of the triangular-shaped tract abutting the property leased by plaintiffs was used by plaintiffs' customers and patrons as a part of the driveway into and out of the filling station and restaurant area. In 1939 the gas company extended a 4-inch gas main to this intersection. The main was laid underground, in the highway right of way. Supply lines were run from the main to the restaurant and filling station. About 40 feet east of the filling station and in that part of the triangular tract over which the highway department had an easement but which was commonly used by plaintiffs' customers, the gas company installed a "drip riser." A drip riser, a facility attached to a gas main, consists of a section of vertical pipe the bottom of which is attached at a low point in the main; the top of which extends approximately to the surface of the ground. It is a conduit through which moisture accumulating at the low point may be pumped out of a main. The drip riser in question consisted of a $\frac{3}{4}$-inch steel pipe 56 inches over-all in length, threaded at both ends. The lower end was screwed into an elbow attached to the low point in the gas main. The top end, above ground originally, was capped. The top end of the drip riser was not covered by any box or protective device. It is not sound, standard or safe construction to install a pipe carrying natural gas in this manner, without any box or encasement to protect it other than the clay earth surrounding it. If the capped end is flush with the ground or below ground, the thrust and pounding of trucks and other vehicular traffic driving on the rock over the pipe will constantly hammer on it, force it down, and eventually damage and break it. A gas pipe may break from metal fatigue if subjected to continuous varying stresses, and shock and vibration transmitted by particularly heavy traffic may cause a break in a pipe. If overlaid with a 2-inch asphaltic surfacing the ground around the pipe would be solidified and the lateral movement of the pipe reduced, but truck wheels could nevertheless transmit

vertical blows to the pipe. The drip riser in question was located in the portion of the filling station driveway which for 20 years was used extensively and constantly by vehicular traffic of all kinds patronizing the filling station and restaurant—automobiles, trucks and heavy transports. It was a busy place, serving 2,500 people a day. The areaway surrounding the filling station and restaurant had been gravelled prior to 1950. There was no indication above ground of a drip riser underground. Plaintiffs, who purchased the property in 1946, had the area around the filling station blacktopped in 1953 with a 2-inch asphaltic surface extending over onto the highway right of way beyond plaintiffs' property line as much as 60 feet, covering the drip riser. Plaintiffs had no knowledge of the existence of the drip riser. Before plaintiffs did the blacktopping in 1953 plaintiffs did not advise or consult the gas company about its underground installations. The gas company made no inspection of the drip riser, from the date of its installation in 1939 until May 16, 1958. The customers had no trouble with the gas service, and the company forgot the drip riser during those intervening years. The gas company made combustible gas tests in the southwest corner of the intersection on December 8, 1957. By 1958 the blacktopping had cracked in numerous places and was breaking up. Plaintiffs decided to have it replaced. This was done on May 12, 1958 under a contract with Land by which the old asphalt paving was taken up, the gravel underneath stabilized where necessary, a 4-inch substantial base provided, and the area paved with a new 2-inch coating of asphalt. On the morning of May 12 Land employees marked off the old surface to be repaved and removed the old asphalt surfacing with a 21,000 pound high-loader, a caterpillar tractor with a steel bucket on its front. When the steel bucket was pushed forward, the teeth on the edge of the bucket broke up the old asphalt. The bucket then picked up the material and loaded it onto dump trucks. Land's operator was instructed to remove the old asphalt and 3 or 4 inches of the base. The foreman for Land asked Bradley Christie if there was any danger of striking "any utilities or anything" in the area in removing the old blacktop surface. Christie stated that he knew of nothing except an electrical conduit to which the current had been cut off. Christie did not tell Land personnel that the repair job extended 50 or 60 feet over onto highway right of way, or mention the gas main because to his knowledge it was between 4 and 5 feet underground. Christie did not consult or check with the gas company as to the location of its mains and underground installations. In removing the old asphalt the operator at all times operated his high-loader bucket from south to north. At no time did he scrape from north to south. At no time did the equipment strike a pipe similar to the drip riser. In removing the asphalt the operator of the high-loader uncovered an area with a 20-foot radius where the earth had a bad odor and was discolored a bluish color like earth through which gas has passed. This indicated that gas was escaping. This blue, smelly dirt was in the area where the drip riser was located. The odor increased as the area of bluish earth was exposed. Where the odor of natural gas was strongest the earth was drier than the earth surrounding it. It was "readily crumbly." It appeared that natural gas had been passing through the clay earth for some time. According to the Land employees, a strong odor or smell of natural gas was in the air all over the area from 8 to 11 a. m., and the odor increased as the blacktop was removed and the area uncovered. Within a period of two months prior to May 12, 1958 two or three telephone calls were made to the gas company by Mrs. Schalley, from Schalley's Liquor Store located across Highway No. 36 on the southwest corner of the intersection, complaining about the odor of natural gas around those premises. The last call was made a week or two prior to May 16, 1958. The employee who took the calls promised to report the complaints but the gas company took no action on these complaints. Franklin Harkrider, employee

at the filling station, testified that "a month or so before the explosion, two months, * * *" he reported to the gas company by telephone that there was a gas leak at the filling station. After having heard a noise at the natural gas meter (which was attached to the filling station some 40 feet from the drip riser), and having smelled a very unusual odor, he had been instructed by his employer to report the leak. Davis Welch, lessee of the filling station, testified that he heard the noise at the meter, smelled the odor of natural gas, and instructed Harkrider to report it; that that evening or the next day a man from the gas company came to the station to investigate. This happened "Sometime prior, two or three weeks, it could be longer, I am not positive, to May 12." The gas man looked around the premises, walked around the meter, then left and did not return. He had no tools and made no adjustments or tests.

About 1 p. m. on May 12, 1958 a fire broke out near the air compressor in the southwest corner of the basement of the filling station, where oil, greases, accessories and tires were stored and a gas-fired furnace and hot water heater with automatic pilot lights were located. After the fire broke out a gas company employee appeared on the premises, looked around and talked to several people, but neither he nor any other gas company employee made any tests with a gas explosion meter. The fire burned until 3 p. m. with heavy, black smoke. At the time the fire broke out the old blacktop had been removed, the base readied, and Land was preparing to lay the new blacktop. After the fire was finally extinguished and by 6 p. m. on May 12 the new asphalt resurfacing was completed. The repaving included the area around the drip riser and the area over the bluish earth. A solid new asphaltic covering would tend to seal the earth off and prevent underground gas from escaping upward. Electrical conduits, toilet drains, water heater and furnace controls were damaged by the fire, but the pipes and fit-tings of the gas distribution system in the station were not damaged. When the electrical breakers were thrown to restore electric service to the pumps on the evening of May 12 three small explosions occurred on the south wall of the basement, at the openings where service pipes entered. The explosions were followed by bluish-red flames of fire running up the basement wall. The fire had no visible means of support. After putting out this flame with water, Christie turned off the gas at the meter outside the building. On May 15 a plumber repaired the toilets and checked out the gas pipes, using soap tests and air pressure in the house lines, and checked the meter, and found that the house lines were sound. Gas service was then restored to the two hot water heaters. On the evening of May 15 a state highway patrol trooper, parked in the filling station near the location of the drip riser, smelled the odor of natural gas. The station was closed up at 10 p. m. that night. At 4:30 a. m. on May 16 a violent explosion and fire occurred, badly damaging the filling station. The windows were blown out, doors broken and bulged. The roof was blown loose. The ceiling beams and a part of the roof fell in. The walls, dislodged and cracked, bulged from the inside outward. The interior was a shambles. The building was rendered worthless and had to be rebuilt from the foundation and floor. After the explosion there was an odor of natural gas pervading the station and whole area, described as "terrific," "strong," "very nauseating," and "very detectable" 100–150 feet from the building. Visible waves of gas were coming out of a catch basin or drain in the driveway. near the riser "like heat waves off a furnace or a hot stove," "like heat off a desert." The area where the gas odor was strongest was barricaded for fear of an explosion if someone lighted a match. Immediately after the explosion a blue blaze similar to gas flames in heaters was seen coming from between the walls, and out of the east wall. A 6 to 8-inch "popping" type of "off and on" flame, blue and of a type produced by natural gas, is-

sued from the pilasters of the building. There was an absence of smoke in the blaze. Gas company employees brought equipment, dug through the newly laid asphalt with shovels and jack hammers, and eventually discovered the leak at the point where the drip riser was located, after a workman struck the riser with a shovel. The clay earth around the riser was tightly compacted. The drip riser had a gradual, uniform, gooseneck bend of about 90 degrees in it, some 8 or 9 inches from the top. The gooseneck part of the riser was 8 to 10 inches below the surface, and when exposed the top of the riser was bent over, pointing to the south. The riser itself was in a vertical position, surrounded by solid clay, standing uprightly in place over the elbow with which it was supposed to be connected. To have been broken at the bottom by a sideways pushing movement at the top a 7½ to 8-inch lateral movement of the riser would have been necessary, but there was no evidence of any such lateral movement. Gas company employees dug down 5 feet around the riser, to the underground main. When it was fully uncovered a leak was discovered where the riser hooked onto the 4-inch main. An audible, loud, hissing noise was heard. Natural gas was escaping in large quantities from the elbow where the riser had been attached to the main. The riser was completely broken or fractured, allowing loose gas to escape from the main. The lower end of the riser had broken off where it entered the elbow, at the threads. A portion of the threads remained inside the elbow connection. The fractures in the pipe appeared to be partly new and partly old. The old fracture went "clear through the pipe wall," and was sufficient to permit gas under 25 to 30 pounds of pressure to leak from the pipe. The earth was moist down to within a foot of the 4-inch main. Around the main the dirt was hard and dried out and lighter than other earth in the area. The gas was blowing "dusty dirt out from around the drip riser where it had dried the dirt out." Leaking gas has a tendency to dry earth and make it lighter in color or give it a grayish cast. This drying out process would have required considerable time—more than 4 or 5 days. When first exposed there was a new, fresh, bright, shiny mark underneath the cap on the top end of the riser, possibly made by the jack hammer. It was 55 to 56 inches from the bottom of the drip riser (2 inches below the bottom of the main) to the top of the asphalt surface. At 8 a. m. on May 16 explosion meter tests in the basement of the restaurant 100 feet north of the filling station revealed an 80% explosive condition. Gas was then seeping into the basement in three places, through mortar joints between the concrete blocks. Doors and windows were opened, fans were installed, and by ventilation the accumulating gas was drawn out as fast as it entered the basement. After the hole in the elbow at the excavation was capped the leakage of gas into the restaurant basement subsided. Explosion meter tests on the afternoon of May 16 showed a 100% explosive condition underneath the asphalt pavement, in cracks and bar holes in the ground along the east wall of the filling station, around pipes entering the basement through the walls, and underground at the southwest corner of the restaurant. Natural gas will travel underground, through porosities in the ground. It follows the line of least resistance. It will follow the line of a gas service pipe. The distance it will travel underground depends upon the porosity of the soil and the pressure under which gas is escaping. It could travel as far as 200 feet. A qualified expert gave his opinion, based upon hypothetical questions, that the fire of May 12 and the explosion and fire of May 16 were the result of the accumulation of gas in the filling station building, and that the accumulation of gas was from the break between the drip riser and the main.

■ From this evidence the jury reasonably could have found that the gas company negligently installed the drip riser by placing it in a position where it would be subjected to the pounding impact of heavy

traffic, without adequate protective coverings; that many years of heavy traffic eventually caused a vibration fracture of the riser at its connection with the 4-inch gas main, thus permitting the escapage of gas in large quantities; that escaping gas, under 25 to 30 pounds pressure, being lighter than air, disseminated in all directions, and following the line of least resistance escaped in detectable quantities into the air surrounding the filling station through breaks in the asphalt pavement and following along the space between the earth and the service line from the main to the filling station, and going through the porous clay soil, eventually entered the basement of the filling station 40 feet away, through openings in the south wall where, after accumulating in sufficient quantities, it was ignited by the automatic water heater flame, causing the fire of May 12; that before and after the fire of May 12 the gas company negligently failed to properly inspect for leakage of gas and negligently failed to repair the leak, although it had notice and sufficient time in which to do so; that the sealing of the driveway with a new base and fresh asphaltic covering on May 12 confined the gas more efficiently and made possible the more rapid accumulation of gas in the basement of the filling station between May 12 and May 16; that gas in explosive quantities, accumulating in the closed station between 10 p. m. on May 15 and 4:30 a. m. on May 16, was ignited by the automatic water heater flame, causing the explosion. There was sufficient evidence of negligence on the part of the gas company to submit the case to the jury. Stephens v. Kansas City Gas Co., 354 Mo. 835, 191 S.W.2d 601; Hardwick v. Kansas City Gas Co., 355 Mo. 100, 195 S.W.2d 504, 166 A.L.R. 556; Messmer v. St. Louis County Gas Co., Mo.App., 42 S.W.2d 963; Sipple v. Laclede Gaslight Co., 125 Mo.App. 81, 102 S.W. 608.

The gas company asks this Court to declare plaintiffs guilty of contributory negligence as a matter of law in failing to notify the gas company of the existence of leaking gas, and in resurfacing the spot over which the gas was leaking, thus concealing and aggravating a dangerous condition. For many reasons this contention may not be sustained. Plaintiffs did not know of the existence of the drip riser, and had never seen it. There is no evidence that plaintiffs knew of the existence of leaking gas (see Nomath Hotel Co. v. Kansas City Gas Co., 300 Mo. 240, 253 S.W. 975, 981), or of facts which would have led ordinarily careful proprietors to appreciate the danger of resurfacing. Bradley Christie had never smelled escaping natural gas on the premises before the day of the explosion. Christie testified that there are very bad odors in the vicinity "all the time"; that he had difficulty in distinguishing one odor from another and that it was debatable whether the odor was from septic tanks or "other things combined." Neither his employees nor his lessee had reported to Christie that they had smelled natural gas. For these reasons he made no report to the gas company. The employees of Land noticed the odor of gas on May 12 but there is no evidence that they reported it to plaintiffs. Bradley Christie saw the bluish-colored earth after the old asphalt was removed and noticed a foul, bad odor but he did not recognize or identify the odor as that of natural gas. There was nothing to show that he knew or should have known that bluish discoloration of ground indicates the presence of escaping natural gas or that the resurfacing of the area would trap natural gas, preventing its upward escape into the air, and increase the danger of explosion by forcing it horizontally along the path of least resistance through the soil into his basement. The clear inference from Christie's testimony is that on May 12, after the fire, a gas company representative came onto the premises to observe conditions. Christie talked to him. Christie could not be held negligent as a matter of law for not revealing to the gas man facts which were as apparent to him as to Christie, or facts of which Christie was not apprised. Under these circumstances the conduct of

plaintiffs was not so clearly negligent that reasonable minds could not differ on the question or such as to justify the court in declaring plaintiffs negligent as a matter of law.

■■ The gas company contends there was no evidence connecting it with the fires and explosions of May 12 and 16 except the opinion of plaintiffs' expert witness Blenberg and that his opinion should not have been admitted in evidence because it was based upon two false and fallacious assumptions. One element of the hypothetical question was the assumption "that for at least a month before May 12, 1958, the odor of natural gas had been present in an area within a forty foot radius" of the drip riser. In its original brief the gas company contends that this premise is false; that plaintiffs' evidence was limited to one instance about two weeks before May 12 and that the question erroneously assumes the fact, not established, that the odor of gas was *continuously present during the entire period*. In its reply brief, however, the gas company acknowledges that plaintiffs' witness Franklin Harkrider testified that he smelled the odor of natural gas at the station "a month or two months" before the explosion, so the inquiry is reduced to whether the hypothetical question was so framed that it assumed the *continuous persistence* of the odor of gas from a time at least a month prior to May 12. We think not. The most reasonable interpretation of the quoted language, in the light of the evidence, is that the odor of natural gas had occurred or been existent at a time at least a month before May 12. Another element of the hypothetical question, after reciting that after the fire of May 12 three small explosions occurred on the basement wall and bluish flames were seen, was the assumption "that at this time gas service to the building *had been cut off* at the meter outside the building." Plaintiffs' witnesses testified that this occurred *before* the gas was turned off at the meter, and the gas company contends that the hypothesis that it occurred *after* the gas was cut off

was extremely damaging. Apparently the gas company would infer that the flames on the wall, which had no visible means of support, were not fed by gas coming through the soil and seeping into the basement through the three service pipe openings, but were fed by gas leaking out of the house lines. It is true that the question as stated reversed the testimony actually given and mistakenly hypothesized the occurrence of the explosions and flames after instead of before the meter was turned off, but we do not find that the gas company was thereby prejudiced. After the fire a gas company employee inspected the gas system in the filling station, found "no damage" and so reported. A plumber who thoroughly tested the house lines on May 15 found nothing wrong—no leaks, breaks or loss of pressure, and everything "tight in the building." Accordingly, there was substantial evidence of the existence of the ultimate fact sought to be hypothesized (that gas was not escaping from the service lines in the building).

■ Next the gas company contends that "The court erred in permitting plaintiffs to offer testimony concerning the deteriorated [condition of the] customers' service pipe belonging to Mr. and Mrs. Schalley." After the May 16 explosion gas company employees crossed the highway and dug up the service line from the gas main to the premises of Schalley's Liquor Store located on the southwest corner of the intersection. The Schalley service line was badly deteriorated, "eaten up," "rotted away," and decayed. It had holes in it, with breaks in the pipe large enough to insert a putty knife. The line was leaking gas so fast that the gas company notified Mrs. Schalley that service would have to be stopped and instructed her to get a plumber "right away." Plaintiffs' property and the Schalley property were directly across the highway from each other. They were both served by the same gas main. The service pipe on the Schalley property and the drip riser on plaintiffs' property were made of the same substance. They were both in-

stalled in 1939 (19 years previously). The Schalley service pipe was laid in cindery soil. Cinders produce acid which has a decomposing and corrosive effect upon pipes. The evidence most favorable to plaintiffs was that the soil in which the two ·pipes were installed was "very similar"; that the earth surrounding the two pipes was "exactly the same." The gas company's evidence indicated that the cindery condition of the soil in which the Schalley service line was laid was not present where plaintiffs' drip riser was installed,· ·but under the favorable evidence rule we must disregard this, and accept as a fact that the soil conditions were similar or the same. The similarity of the substance of the two pipes, the condition of the soil in the two locations, the almost equal length of time the two pipes had laid in the ground (approximately 19 years), the proximity of the two properties, and the effect of cindery ·soil on pipe, were facts known to the gas ·company. Mrs. Schalley had smelled the ·odor of natural gas over a period of several weeks prior to May 16 and had reported ·this to the gas company by telephone several times. Plaintiffs' lessee's · employee ·had alerted the gas company by reporting natural gas odors at the filling station one ·or two months before May 12. A gas company, notified of escaping gas, is under a ·duty to act; to repair the defect or cause ·it to be repaired, or shut off the flow of ·gas until repairs are made. Barrickman v. National Utilities Co., Mo.App., 191 ·S.W.2d 265, 268. Under the evidence the jury could have found that the gas company following Mrs. Schalley's telephone notice ·and in response to its duty to make an ·investigation as to the cause of the es-·capage of gas at the Schalley Liquor ·Store, in the exercise of the degree of care imposed upon the supplier of a dangerous ·commodity like natural gas, would have ·discovered the deteriorated condition of the Schalley service pipe; and that, having ·notice of the escapage of natural gas at ·plaintiffs' filling station during the same ·period of time, and knowledge of the simi-larity of the conditions in the two installations, the gas company was alerted to the existence of a potentially dangerous condition at plaintiffs' filling station so as to be put on inquiry, and thereby required to test, investigate ,and excavate plaintiffs' gas pipes and service facilities, and that such excavation would have revealed the break in the drip riser in time to have repaired the defect or caused it to be repaired, or to have shut off the flow of gas until repairs were made. Golden v. National Utilities Co., 356 Mo. 84, 201 S.W.2d 292; Nomath Hotel Co. v. Kansas City Gas Co., 300 Mo. 240, 253 S.W. 975. Under these circumstances evidence of the deteriorated condition of the Schalley service pipe was admissible to substantiate Mrs. , Schalley's testimony that she detected the odor of gas, a circumstance bearing upon the question of notice to the gas company that gas was escaping on the Schalley premises, which in turn bore a reasonable relation to the escape of gas on plaintiffs' property.

■■ The next question is the admissibility in evidence of public service commission rules and regulations providing that pipes on *customers' premises* be maintained in a safe, efficient and proper operating condition by and at the expense of the customer. The gas company claims these rules and regulations are controlling; that they impose upon the property owner the responsibility and first duty of maintenance of service pipes and connections (on private property); and therefore that it was not a "primary obligation" of the gas company to discover, repair and stop the leak on the Schalley premises. The gas company contends these rules were admissible to rebut the testimony with reference to the Schalley service pipe. The trial court correctly excluded this evidence. It was immaterial. "[A] gas company is *not relieved of all duty and responsibility* after notice that gas which it furnishes is escaping from appliances and pipes on private property. Notice changes the usual rule of responsibility of the respective

parties and the ordinary rule does not apply." Hanson v. City Light & Traction Co., 238 Mo.App. 182, 178 S.W.2d 804, 809.

■ The gas company asserts error in permitting plaintiffs' counsel in final argument to make "four prejudicial references to the deteriorated Schalley pipe." The attorney reminded the jury of testimony that the Schalley line was leaking so badly that the serviceman could stick his putty knife in the crack and that the plumber testified that the pipe was full of holes. The gas company complains that no argument based upon the deteriorated condition of the Schalley service line should have been permitted; that it had no place in the case because a service line on private property is the responsibility of the customer and not of the gas company and that the court, inconsistently, excluded the public service commission rules and regulations but permitted the argument, stating that there was "no contention in the case one way or the other about any service line insofar as the plaintiffs are concerned or as far as the Gas Service Company is concerned. It seems to me that the only contention in the case has to do with the Gas Company's drip riser * * *." We find no error in the action of the court. The deteriorated condition of the Schalley service line was properly in the case to substantiate the fact that gas leaked therefrom, gas detected by Mrs. Schalley and reported by her to the gas company several times, and therefore was a proper subject of argument. We interpret the court's remarks as an observation that the contention was not that the gas which caused the explosion came from defects in the Schalley service line; that the only issue arising out of a defect related to a defect in the drip riser in plaintiffs' driveway.

■ The gas company claims error in sending the drip riser pipe and its connecting pipes to the jury room, at the request of the jury, during the course of its deliberations. Expert architects, engineers and metallurgists testified for days with respect to the scientific questions involved. Micro-photographs and microscopic reports of the breaks in and marks on the drip riser were introduced. It is argued that having been the subject of extensive expert testimony, it was an error to send the pipes to the jury room for the personal inspection of the jurors, two of whom were plumbers, for the jury to "form their own idea of what happened to the pipes." The objection is to the giving of an "invitation [to the jury of laymen] to pass expert judgment on a matter which had engrossed the court for days in presenting disputed expert testimony," and to the two plumbers "to advise their colleagues of their own particular opinions and to disregard the testimony of the experts and the laboratory findings on both sides," without the benefit "of oath, rules of evidence, court or counsel." We find no merit in these contentions. It was the proper function of the jury to form an idea and judgment as to what happened to the drip riser pipes. The jury was not limited in this process to the expert evidence before them. The jurors were entitled to use their own experience and to draw on the common experience of mankind, in addition to the expert testimony before them, in forming this judgment. There is nothing in the record to substantiate the fears of the gas company that the two plumbers on the jury assumed charge, directed the jury to disregard the expert testimony, and dictated to the other jurors what happened to the pipe. The jurors are presumed to have followed their oaths and to have rendered a verdict according to the evidence.

Finally, the gas company asserts error in permitting plaintiffs to dismiss their case without prejudice against co-defendant Land Construction Company, without allowing the jury to be advised that Land's motion for a directed verdict had been overruled. The claim is that Land was "an obvious phony co-defendant," a comrade, ally and friend of plaintiffs; that there was collusion between plaintiffs and

Land; that although in their several petitions they charged Land with specific negligence (breaking the drip riser with their earth grading excavator) plaintiffs adduced no evidence against Land at the trial, and throughout the case joined with Land's attorney in objecting to any evidence which might prove plaintiffs' charge of negligence against Land; that when Land's counsel moved to strike out testimony against Land, plaintiffs' counsel joined in his "adversary's" motion; that at the completion of Land's cross-examination of the gas company's witness, Land's counsel turned to plaintiffs' counsel in the courtroom and asked "Do you think of anything else?", to which plaintiffs' counsel replied to his "bosom adversary," "No, I think not." The gas company complains that it had to share its jury panel challenges with this "phony" co-defendant; that this collusive agreement permitted plaintiffs and Land to place each others' witnesses on the stand, thus permitting each of them to cross-examine and lead his own witnesses. The gas company further complains of the manner in which the court informed the jury of the fact that Land was no longer in the case. After the court overruled Land's motion for a directed verdict, plaintiffs nevertheless dismissed as to Land. The court announced that "the case has been dismissed against the defendant Land Construction Company," instead of announcing that Land had presented a motion for a directed verdict which had been overruled, and that after this action of the court plaintiffs dismissed against Land. The gas company says that it was entitled to have the jury weigh the unusual relationship of plaintiffs and Land, having suffered under the challenges and the rules of evidence "by having one adversary at [its] front and the other at [its] back," and contends that a plaintiff may not on his own motion dismiss a suit at any time and under all circumstances; that he does not have an absolute right to dismiss, and that the dismissal of the case against Land in the fashion in which it was done caused the gas company to suffer an unusual hardship.

 We find no error in the action of the court in allowing the dismissal. Section 510.130 RSMo 1949, V.A.M.S., and Civil Rule 67.01, V.A.M.R., provide that "A plaintiff shall be allowed to dismiss his action without prejudice at any time before the same is finally submitted to the jury, * * * and not afterward." Plaintiffs dismissed without prejudice at the close of all of the evidence, after the court had overruled Land's motion for a directed verdict, and before the case was submitted to the jury. The record does not clearly demonstrate collusion or that the gas company was deprived of any legal defense or subjected to any increased liabilities, or that its rights were prejudiced or embarrassed by the dismissal. Contrary to the gas company's contention, the jury was advised that Land's motion for a directed verdict had been overruled. The gas company's counsel told the jury: "When you went out just this morning, when the evidence was concluded, the Land Construction Company brought a motion before the Court to let them out, and the Court refused." True enough, the court on objection indicated that this was a matter for the court and not for the jury and admonished counsel not to comment *further* on that, but the argument was not stricken and the jury was not instructed to disregard it. The gas company counsel forcefully argued that plaintiffs had filed three successive petitions in the course of a year and a half, in each of which plaintiffs charged Land with negligently having broken the drip riser with their excavating equipment, thus releasing the gas, but that plaintiffs at the trial had pointedly avoided inquiring of Land's operator whether he broke the pipe; and made considerable reference to the lack of adversary conflict between plaintiffs and Land at the trial; implied that something was "going on behind the scene"; asked "who is pulling the wool over your eyes?", and informed the jury that after the court had refused

to let Land out of the case plaintiffs dismissed their case against Land "and won't let you pass on it * * * wouldn't let you pass on Land's implication in this case." Having thus exploited the situation to the fullest and having given the jury every opportunity to "weigh the unusual relationship of plaintiffs and Land," the gas company has no cause for complaint.

Finding no reversible error the judgment is affirmed.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.