**Otis FIELDS, Appellant,**

v.

**MISSOURI POWER AND LIGHT COMPANY, Respondent,**

and

**Vincent B. Becker and J. E. Evers, doing business as Becker and Evers Maytag Company, Appellants,**

and

**Elmore Turner and Calvin Jones, Defendants.**

No. 49712.

Supreme Court of Missouri,

Division No. 2.

Dec. 9, 1963.

Motion for Rehearing or for Transfer to Court En Banc Denied Jan. 13, 1964.

Rozier, Carson, Inglish, Nacy & Monaco, Jefferson City, Edward V. Sweeney, Monett, William H. Burden, Joplin, for appellant Otis Fields.

John L. Hearne, Jefferson City, William H. Sanders, Dean F. Arnold, Kansas City, for appellants Vincent B. Becker and J. E. Evers; Keyes, Bushman & Hearne, Jefferson City, Caldwell, Blackwell, Sanders & Matheny, Kansas City, of counsel.

J. D. James, Henry Andrae, Hendren & Andrae, Robert L. Hawkins, Jr., Graham & Hawkins, Jefferson City, for respondent Missouri Power & Light Co.

STOCKARD, Commissioner.

This is an action by Otis Fields to recover damages for personal injuries sustained on August 11, 1958, from an explosion of gas in a room which he occupied as a tenant. The jury returned a verdict for $100,000 in favor of plaintiff and against Elmore Turner, the owner of the house. It also returned a verdict against plaintiff and in favor of defendants Missouri Power and Light Company (hereinafter referred to as Mo. P. & L.), Vincent B. Becker and J. E. Evers, doing business as Becker and Evers Maytag Company, (hereinafter referred to as Becker & Evers), and Calvin Jones. The trial court sustained plaintiff's motion for new trial as to Becker & Evers, and overruled the motion as to Mo. P. & L and Calvin Jones. Plaintiff appealed from the judgment in favor of Mo. P. & L. and Calvin Jones, and Becker & Evers appeal-

ed from the order sustaining the motion for new trial as to them. Elmore Turner has not appealed. Subsequent to the perfection of the appeal, plaintiff has dismissed his appeal as to Calvin Jones.

In August 1958, Turner employed Calvin Jones to install additional gas pipes in a house at 611 School Street, Jefferson City, Missouri, to make gas available to the second floor. Jones tapped the supply of gas entering the basement and installed what is referred to as a "meter loop" which is an arrangement of the gas pipe so that a gas meter could be installed to measure the gas supplied to the second floor of the building. In the new gas line, at a place before gas would reach the meter loop, Jones installed a valve known as a "lock-wing cock" and by it the flow of gas could be turned off or on. Past the meter loop he installed a gas pipe with two "risers" or pipes extending vertically to the second floor, one extending to the hallway on the second floor and the other extending to the second floor bathroom. From this second riser there were two terminals of three-quarter inch pipe, one extending to the bathroom and the other to a room designated as the kitchen and terminating in the cabinet under the sink.

Calvin Jones testified that when the lock-wing cock was installed it was turned off and sealed by means of a steel clevis inserted through matching holes on the two wings of the valve with a copper wire inserted through holes in the clevis and sealed by a lead seal. Elmore Turner denied that such a seal was ever placed on the lock-wing cock. Jones also testified that caps were placed on the terminals in the hallway and in the bathroom, but that at the express direction of Turner he did not place a cap on the terminal under the sink in the kitchen. Turner had started the construction of cabinets under the sink, and, according to Jones, Turner stated that he wanted to fit the flooring of the cabinet over the pipe and then connect a gas range to that terminal. Turner denied that he gave such instructions, and he further denied that he then or at any time prior to the explosion knew that the terminal was not capped. Between August 23 and October 3 Turner installed the flooring in the cabinet around the uncapped terminal pipe. On October 3 he made application to Mo. P. & L. for gas service, and Cecil Horn, a serviceman for Mo. P. & L., installed a meter in the meter loop which had been installed by Jones. Horn testified that he found the lock-wing cock to be in the "off" position and sealed with a clevis, some copper wire and a lead seal; that he did not turn on the gas; that he made no inspection of the pipes past the meter; and that Turner told him to "leave things as they are now," that is, not turn on the gas, because "there is a pipe open upstairs, and it is not finished." Turner admitted that Jones did not turn on the gas, but he said that he did not know the reason for his not doing so. He subsequently testified, however, that he asked Horn "to lock the meter" but Horn said that he had already read the meter, that "it wouldn't be necessary to shut it off," and that "when we got ready for gas to turn it on." Horn testified that he told Turner to call the office of Mo. P. & L. when the piping was finished and a man would be sent to break the seal, turn on the gas and establish service. Mo. P. & L. did not thereafter receive any request from Turner, or anyone else, to turn on the gas.

On October 11, pursuant to a request from Turner, Becker & Evers sent its serviceman Ray Luecke to install two gas space heaters. He first installed one of them on the first floor by making a connection with copper tubing to a pipe in the basement. The gas to this heater was received through pipes other than those installed by Jones and was measured through a meter other than the one installed by Horn. When that installation was completed Luecke went to the second floor to install the second space heater. This heater was not connected to a terminal installed by Calvin Jones, but was connected to a terminal on the second floor in the south or front room near a flue

which everyone concerned denied that he installed. The pipe to this new terminal received its supply of gas through a connection near the meter loop installed by Jones. However, its installation did not affect the flow of gas through the pipe installed by Jones to the uncapped terminal in the second floor kitchen. Horn testified that this new pipe was not in place when he installed the meter on October 3. Turner testified that Luecke made the installation on the morning of October 11. Luecke denied this and testified that Turner or someone else installed this new pipe while he was working on the first floor space heater, and that he did nothing more than install copper tubing from the gas pipe terminal near the flue to the space heater which he installed in the second floor hall. According to Luecke, after he made the second floor installation, he went to the basement and by the use of a wrench turned on the lock-wing cock which permitted the gas to flow to the space heater on the second floor. Luecke testified that when he turned on the gas, the lock-wing cock was not sealed, and that he would not have turned it on if it had been sealed. When asked whether he heard a clicking noise when he turned on that meter he replied, "Not that I can recall." He could not remember whether he made any special effort to hear such a noise, but he later testified that if there had been any clicking in the meter he would have remembered it, and that if there had been a three-quarter inch pipe open when he turned on the valve the meter "would make a rapid clicking noise" and he would have had no trouble hearing it. On all gas meters there are two dials near the top. The hand on one dial makes a complete revolution for each one-half cubic foot of gas passing through the meter and the other hand makes a complete revolution for each two cubic feet of gas passing through the meter. Mr. Luecke testified that with a three-quarter inch pipe open, the hand registering each one-half cubic foot of gas would "turn rapidly" or "fairly fast." He stated, however, that he could not say that

he did or did not observe that dial to see whether gas was flowing through the meter when he turned on the lock-wing cock.

At the time Calvin Jones installed the gas pipes in the building, Elmore Turner planned to have an apartment on the second floor. By October 3 that plan was abandoned. Plaintiff was a student at Lincoln University and about October 3 he occupied as a bedroom the room designated in the testimony as the kitchen where under the sink the three-quarter inch gas pipe had been left uncapped. On October 11 he left the premises about 7:30 o'clock in the morning to go to his employment at the university. He returned to his room for about ten minutes shortly after noon and noticed that the gas space heater had been installed in the hallway. He detected no gas odors at that time. About 4:00 o'clock that afternoon Turner went into the house and turned off the space heaters because it was hot; the outside temperature being about 71 degrees. Turner also opened the windows in plaintiff's room and in other parts of the house. He smelled an odor which he described as fumes from the space heaters. Plaintiff returned to his room about 6:00 o'clock, wrote a letter, took a bath, changed his clothing and left about 8:00 o'clock. While at the house he detected an odor which he identified as the burning of new paint. The odor was strong and because he had some doubt as to what it was, he held a lighted match to the connections on the space heater in the hall to check for a gas leak and found none. When he left the premises he went directly to Elmore Turner's house to watch television, and while there he told Turner that he had smelled an odor in the house which "some of the boys" thought was gas. Turner testified that when plaintiff started to leave he told him that if he smelled any gas to call him and he would "shut the gas off at the meter." Plaintiff returned to his room about 11:00 o'clock. At that time Robert Lee Mitchell, a downstairs tenant, talked to plaintiff, and Mitchell testified that he could then smell gas.

Plaintiff stated that the odor he smelled earlier was still there but was faint. After spending a few minutes in the bathroom, plaintiff entered his room, struck a match to light a cigarette, and in his words, "there was a hissing sound and then there was an explosion." Plaintiff was burned, and when he tried to leave the room he could not get the door open. He then tried to leave by the window, and at that time a second explosion occurred which knocked him out of the window and to the ground. A fireman subsequently discovered the uncapped pipe in the cabinet beneath the kitchen sink, and the gas was turned off at the lock-wing cock in the basement.

Plaintiff submitted his case against Mo. P. & L. on two theories. The first, submitted in instruction A–1, was that Mo. P. & L. connected the new and theretofore unused system of gas pipes on the second floor of the Turner house to its gas supply through a meter installed by it, and "at the time said defendant installed said meter the lock-wing cock controlling the flow of gas through said meter was not sealed, and * * * [Mo. P. & L.] failed to seal said meter after completing said installation, and * * * [Mo. P. & L.] knew or in the exercise of ordinary care could have known that its failure to seal said meter created a danger to persons in said building in that it permitted gas to be turned on at said meter without a proper inspection of said gas system and gas pipes." There was no evidence that a meter could be sealed. The only reference in the evidence is to the seal on the lock-wing cock located a short distance from the meter and not constituting a part of it. References in the instructions and briefs to a "sealed meter" or failure to "seal the meter" will be deemed to refer to the lock-wing cock. The second theory, submitted in instruction A–2, was that Mo. P. & L. supplied to the building of Elmore Turner natural gas which "was not odorized so as to enable Otis Fields to detect its presence in his room." The jury found against plaintiff on both submissions. On this appeal he now con-

tends that he was entitled to a third submission as set forth in his requested but refused instruction A–8 which submitted as negligence on the part of Mo. P. & L. that it "installed a gas meter at the building owned by Elmore Turner * * * and connected said meter to the system of pipes supplying gas to the second story of said building" when its employees and agents knew "that there was an uncapped gas pipe on the second floor of said building," and "permitted said meter to remain connected to said system of pipes and failed to cap said uncapped pipe." The instruction then hypothesized that if the jury found that Mo. P. & L. "by the exercise of ordinary care could have anticipated that its action in so doing was likely to result in injury to persons on or about said premises; and if you find that * * * [Mo. P. & L.], by failing to cap said pipe and by permitting its meter to remain connected under conditions aforesaid failed to exercise ordinary care and was negligent, and if you find that as a direct result of such negligence of said defendant, * * * natural gas accumulated in the room occupied by plaintiff on October 11, 1958, and exploded, causing plaintiff to be injured, then your verdict should be in favor of plaintiff * * * and against [Mo. P. & L.] unless you find the plaintiff was guilty of contributory negligence as submitted in other instructions."

▆▆ A supplier or distributor of natural gas, such as Mo. P. & L., is not an insurer as to injuries resulting from leaks or other defects in gas distributing systems not owned by it or under its control. Stephens v. Kansas City Gas Co., 354 Mo. 835, 191 S.W.2d 601, 609; Nomath Hotel Co. v. Kansas City Gas Co., 204 Mo.App. 214, 223 S.W. 975, 980. However, as a general rule, it may be guilty of negligence if a leak or other defect in the pipes or an appliance of a customer causes injuries to persons or property, provided the supplier or distributor has sufficient notice of such leak or defect, and having such notice (a) negligently inspects or negligently repairs; (b) agrees and assumes to inspect

and repair, and then fails to do so; (c) refuses to inspect and repair knowing a dangerous condition exists, and with such knowledge fails to shut off its gas until the owner can have his defective pipes or appliance properly repaired. Weber v. Interstate Light & Power Co., 268 Wis. 479, 68 N.W.2d 39. See also Hanson v. City Light & Traction Co., 238 Mo.App. 182, 178 S.W.2d 804; Barrickman v. National Utilities Co., Mo.App., 191 S.W.2d 265; Wood v. Gas Service Co., 8th Cir., 245 F.2d 653; Gas Service Co. v. London & Lancashire Ins. Co., 8th Cir., 188 F.2d 404; Gas Service Co. v. Payton, 8th Cir., 180 F.2d 505; Gas Service Co. v. Helmers, 8th Cir., 179 F.2d 101; Skelly Oil Co. v. Holloway, 8th Cir., 171 F.2d 670; Mississippi Public Service Co. v. Cunningham, 189 Miss. 179, 195 So. 472; Brett v. City of Memphis, 33 Tenn.App. 522, 232 S.W.2d 360; Oklahoma Natural Gas Co. v. Appel, Okl., 266 P.2d 442; Steele v. Peoples Natural Gas Company, 386 Pa. 439, 127 A.2d 96; Annotation, Liability of gas company for injury or damage due to defects in service lines on consumer's premises, 26 A.L.R. 2d 136; 24 Am.Jur. Gas Companies § 32; 38 C.J.S. Gas § 42d. In this case Mo. P. & L. knew of the defect in the customer's gas pipes, and it did not turn on the gas even though it installed the meter. The flow of the gas admittedly was completely "shut off" by means of the lock-wing cock whether or not it had a seal on it. However, plaintiff's requested instruction A–8 ignored the fact that by means of the lock-wing cock the flow of gas into the distribution system in the Turner house was as completely shut off after the installation of the meter as before. Instead, the instruction submitted as negligence only the conclusion that by installing the meter when it knew of the uncapped pipe, Mo. P. & L. could have anticipated that injury to persons on or about the premises was likely to occur. If it should have anticipated this result it is only because it should have anticipated that some unauthorized person might or would turn on the gas at the lock-wing cock. But this fact is not hypothesized and submitted in instruction A–8.

Plaintiff relies on eight cases from other jurisdictions. Hebert v. Baton Rouge Electric Co., 150 La. 957, 91 So. 406, 25 A.L.R. 245; Christo v. Macon Gas Co., 18 Ga.App. 454, 89 S.E. 532; and Hohnemann v. Pacific Gas & Electric Co., 35 Cal.App.2d 597, 96 P.2d 350, all hold that a supplier of gas owes the duty of ascertaining that the outlets in a customer's distribution system are closed before turning on the gas. Lynchburg Gas Co. v. Sale, 160 Va. 783, 169 S.E. 577, and Hayes v. Cohoes Gaslight Co., 183 App.Div. 182, 170 N.Y.S. 312, hold that this duty cannot be delegated to someone else. These cases go no further than the general rule previously set out. In Bray v. Atlanta Gas-Light Co., 46 Ga. App. 629, 168 S.E. 96, the supplier of gas was held to be negligent when it permitted the instrumentality controlling the flow of gas to be unlocked and "exposed and easily accessible and in a condition in which any one can easily use it to turn on the gas * * * and where it can reasonably be foreseen that some one might turn on the gas." In Schmeer v. Gaslight Co. of Syracuse, 147 N.Y. 529, 42 N.E. 202, 30 L.R.A. 653, it was held that the supplier of gas was negligent when it installed a meter without inspecting the customer's system but only received a copy of the plans for piping in the building and then by custom permitted untrained "gas fitters," not in its employment, to turn on the gas. Sawyer v. Southern California Gas Co., 206 Cal. 366, 274 P. 544, is the principal case upon which plaintiff relies. In that case the supplier of gas, at the request of the owner, installed four meters in a building in which there were four business establishments, each meter being connected to a gas distribution system of pipes for one of the business establishments. Three of the meters were turned on and service established to three of the tenants of the building, one being a bakery. The remaining meter,

which was connected to pipes installed to supply gas to an automobile accessories store, was not turned on, and at the time of the installation of this meter no test was made, by turning on the gas and observing the dials on the meter, to determine whether or not there was a leak in the pipes. There was in fact, an uncapped pipe in the accessories store. Approximately one year later while installing a new oven in the bakery, an employee of the seller of the oven apparently turned on the meter to the accessories shop "inadvertently as the result of a confusion as to which of the several meters served the different shops" thereby permitting gas to escape through the uncapped pipe. An explosion resulted injuring the plaintiff, who was a customer in the accessories shop. The trial court entered a judgment of nonsuit in favor of the gas supplier. On appeal the court first ruled that a question for a jury may arise as to negligence of a gas supplier which turns on a meter to an uncapped gas pipe. It then pointed out that the gas supplier had not issued any rule prohibiting its patrons from turning on and off the supply of gas at the meter after the original establishment of service but that in fact its rules contemplated that they should. It was then held that it "should have occurred to the employes of the gas company, * * * that occasions might arise when other tenants would wish their meters turned off and on again and in so doing persons less familiar with the handling of gas and gas appliances than the agents of the company might become confused as to which of the meters served the several shops." The judgment of nonsuit was reversed.

■ It thus appears, and we think properly so, that in some factual situations when a supplier of gas learns of a defect in a customer's system, merely shutting off the flow of gas is not sufficient when by reason of the location of the device used to shut off the gas, or because of the characteristics of the device, or because of other facts, an ordinarily prudent person would reasonably foresee that some unauthorized person might turn on the gas before the defect in the customer's pipes would be remedied. In such situation the supplier must, in the required exercise of care, correct the defect, or turn off the gas and take reasonable precautions to prevent an unauthorized turning on of the gas. However, none of the cases cited by plaintiff indicate that in the submission of his case to the jury, a plaintiff can ignore the fact that the gas was in fact shut off and submit only the factual situation that a meter was installed when a defect is known. The essential and determining factor is whether upon electing not to correct the defect, Mo. P. & L. effectively shut off the gas. If it is plaintiff's contention that the use of the lock-wing cock to shut off the gas after installing the meter did not result in an effective shutting off of the gas because an unauthorized person might turn it on, then in the submission of his case he must hypothesize facts, supported by the evidence, which would authorize or permit such a finding on the part of the jury. Instruction A–8 did not purport to do this, and therefore, assuming that the evidence would support such a submission, a question we need not decide, the instruction was properly refused.

Instruction B–2, given at the request of Mo. P. & L. was a cautionary instruction as follows: "The court instructs the jury that the words 'negligence' and 'negligently' as used in these instructions with reference to defendant Missouri Power & Light Company mean a failure to exercise ordinary care. You are further instructed that the words 'ordinary care' as used in these instructions with reference to defendant Missouri Power & Light Company mean such degree of care as an ordinarily prudent person would exercise under the same or similar circumstances as a supplier of natural gas." Plaintiff asserts that "when applied to the facts of this case" this instruction is erroneous in that (1) it "minimizes the duty and responsibility" of Mo. P. & L. and (2) it "fails to instruct the jury that the gas company is under a duty

in the exercise of ordinary care to exercise precautions commensurate with the dangers to be reasonably anticipated under the circumstances." Plaintiff admits that the duty of Mo. P. & L. was to exercise "ordinary care." It contends, however, that the duty of "ordinary care" encompasses more than the instruction said it did.

The wording of instruction B–2 apparently was taken from language used in Stephens v. Kansas City Gas Co., 354 Mo. 835, 191 S.W.2d 601, 609, where it was said that "The Gas Company was only required to use such degree of care as an ordinarily prudent person would exercise under like circumstances in dealing with such a dangerous commodity," and in which it was held reversible error to instruct that "due care" as used in instructions with reference to the duty of a supplier of gas meant "the highest degree of care" defined as "that care which a very careful and prudent person would use under the same or similar circumstances." We conclude that the definition of the term "ordinary care" in instruction B–2 was not erroneous, and it did not constitute a misdirection to the jury. What plaintiff contends should have been in the instruction is no more than another way of saying the same thing, but in a way probably more favorable to plaintiff. No clarifying or amplifying instruction was requested by plaintiff and the trial court cannot be charged with error in giving the instruction it did in the absence of such a request. Thurman v. St. Louis Public Service Company, Mo., 308 S.W.2d 680, 687; Redick v. M. B. Thomas Auto Sales, Inc., 364 Mo. 1174, 273 S.W.2d 228, 236.

Plaintiff next challenges instruction B–5 given at the request of Mo. P. & L. which told the jury that Mo. P. & L. had "no duty to inspect gas pipes not owned by it and located in a customer's building and is not responsible for injuries resulting from the escape of natural gas through a defect in pipes within such building unless [it]

* * * knew or should have known of such defect in which case its duty under the law is discharged by turning off or not turning on the supply of gas until such time as the owner of the defective pipes shall have corrected the defects in them." Following this general statement, the instruction then hypothesized that if the jury found that Mo. P. & L., acting through Cecil Horn, installed the gas meter at the request of Turner, that Horn "found the lock-wing cock or valve in the gas line immediately ahead of said meter in the off position and sealed," that Turner advised Horn of unfinished piping on the premises, that Horn left the lock-wing cock or valve in the off position and sealed, and that neither on that date nor at any time thereafter and prior to the explosion did any agent of Mo. P. & L. turn on the lock-wing cock or valve, then the verdict should be for Mo. P. & L. *under the charge of negligence as submitted in instruction A–1.* Plaintiff challenges this instruction on the grounds that while it "purported to cover the entire case" it (1) "ignores the actual notice of the evidence of the uncapped pipe in the building" and tells the jury that Mo. P. & L. had no duty except to leave the lock-wing cock or valve in an off position and sealed; (2) it conflicts with the theory of Mo. P. & L. "in that it states that its only duty was to turn off or not turn on the supply of gas to the premises;" (3) it "tells the jury that unless the gas was turned on by Cecil Horn or any other authorized agent of the defendant" a verdict must be for Mo. P. & L.; (4) it sets up intervening cause as a complete defense; (5) it is "a misstatement of the law and is a misdirection;" and (6) it ignores entirely the issue of defendant's negligence for failure to exercise ordinary care commensurate with the dangerous character of its product, and does not require or commit the jury to determine whether said defendant's conduct was in the exercise of ordinary care and is tantamount to a directed verdict in its favor, and ignores the question of whether Mo. P. & L. could, or should have, foreseen that its acts and omissions were likely

to result in injury to persons on or about the premises.

We should first note that the instruction does not purport to cover the entire case in that it does not refer to the submission in instruction A–2, pertaining to the failure to odorize the gas. Also, it does not ignore the admitted notice to Mo. P. & L. of the uncapped pipe because it hypothesizes that Turner told Horn "of unfinished interior piping on the premises."

■■ As previously noted, plaintiff did not hypothesize facts in his submission of the case, or in his requested instruction A–8, which if found to exist, would authorize a finding that upon being advised of the uncapped pipe, Mo. P. & L. should have done more than shut off the supply of gas when it elected not to correct the defect. Therefore, plaintiff having selected the scope of the issues, Mo. P. & L. was entitled to an instruction presenting its theory within those issues. As demonstrated by the cases previously cited, instruction B–5 correctly set forth the general rule applicable to the duty of Mo. P. & L. within the scope of the issues selected by plaintiff, and it then hypothesized facts which, if found by the jury, entitled Mo. P. & L. to a verdict in its favor. Under instruction B–5, Mo. P. & L. was not entitled to a verdict generally, but only under the charge of negligence as submitted in instruction No. A–1. Therefore the instruction was in fact a form of a converse instruction, but not what is known as a "true converse" instruction. See Liebow v. Jones Store Company, Mo., 303 S.W.2d 660. Without detailing each of the contentions of plaintiff and discussing them separately, it is evident that this disposes of all of plaintiff's challenges concerning instruction B–5, except that the second and sixth contentions merit some separate comment.

In the second contention plaintiff asserts that instruction B–5 conflicts with the theory of Mo. P. & L. in that it states that the only duty of Mo. P. & L. was to turn off or not turn on the supply of gas. We do not see where this amounts to a conflict. In his argument plaintiff asserts that the instruction should have submitted to the jury the issue of whether Mo. P. & L. shut off or did not turn on the gas and let the jury determine what would constitute turning the gas on or off "instead of arbitrarily telling the jury that the action of [Mo. P. & L.] * * * in leaving the cock in the off position and the little seal on the meter was a full discharge" of its duty. In instruction A–1 plaintiff submitted as negligence on the part of Mo. P. & L. that the "meter was not sealed, and * * * [Mo. P. & L.] failed to seal said meter after completing said installation." The issue was whether Mo. P. & L. effectively shut off the gas when it elected not to repair the defect, and although not using the term, by instruction A–1 plaintiff submitted, in effect, that the gas was not shut off because there was no seal on the meter, that is, on the lock-wing cock. He cannot now complain that Mo. P. & L. submitted the contrary, or that because the lock-wing cock was in an off position and sealed that the supply of gas was shut off.

In the sixth contention plaintiff asserts that instruction B–5 ignores the issue of defendant's negligence "for failure to exercise ordinary care commensurate with the dangerous character of its product and does not require or commit the jury to determine whether defendant's [Mo. P. & L.] conduct was in the exercise of ordinary care." Plaintiff overlooks the fact that the issue of ordinary care was submitted in plaintiff's instructions, and by instruction B–5 the jury was told that if it found the facts to be as hypothesized then, as a matter of law, the verdict should be in favor of Mo. P. & L., not generally, but only under the charge of negligence as submitted in Instruction No. A–1. Mo. P. & L. was not required to "cover the field" as to its lack of negligence, but when instruction B–5 was so limited, it was required only to submit facts which, if found to be true, result-

ed in plaintiff not being entitled to a verdict under its instruction A–1. This, the instruction did.

Plaintiff next challenges instruction B–6, a converse instruction. Instruction A–2 submitted as negligence on the part of Mo. P. & L. that "the gas so supplied was not odorized so as to enable Otis Fields to detect its presence in his room in said building." By instruction B–6 the jury was told that "unless you find and believe from the evidence that defendant Missouri Power & Light Company negligently failed to odorize the said natural gas which flowed into plaintiff's room at said time, then plaintiff is not entitled to recover against defendant Missouri Power & Light Company and your verdict must be for the defendant Missouri Power & Light Company under the charge of negligence as submitted to you in Instruction A–2." Plaintiff asserts that instruction B–6 is erroneous because (1) it fails to require a negative finding of the jury of all the material facts in plaintiff's instruction A–2, (2) it "merely tells the jury that if it finds that the defendant gas company failed to odorize the said natural gas, then plaintiff is not entitled to recover," and (3) the instruction is "confusing and misleading" in that it tells the jury that "the mere odorization of the gas at some distant point, at some indefinite time, would amount to odorization without setting out that the gas should be odorized to such an extent that the odor would be discernible in plaintiff's room while he was present at a time prior to the explosion."

■ As to the contention that the instruction fails to require a negative finding of all the material facts in the instruction, plaintiff asserts, in his argument, that "the important thing" which it failed to converse "was the fact that it [the gas] was not odorized so as to enable Otis Fields to detect its presence in his room." However, by reason of this requirement plaintiff's instruction A–2 was clearly erroneous. The duty of Mo. P. & L. to odorize natural gas was not necessarily to odorize

it so Otis Fields could detect it, but to odorize it so that it could be detected by a person with a normal sense of smell. Thompson v. Economy Hydro Gas Co., 363 Mo. 1115, 257 S.W.2d 669; Winkler v. Macon Gas Co., 361 Mo. 1017, 238 S.W.2d 386. We think that plaintiff should not be entitled to complain that defendant's converse instruction failed to converse an erroneous feature of plaintiff's instruction. However, there is another reason why this contention has no merit. In addition to the phrase quoted above, instruction A–2 required findings that Mo. P. & L. knew or should have known that "its failure to supply *odorized gas*" would prevent plaintiff from detecting such gas, and that Mo. P. & L. "by supplying gas which was not *odorized* failed to exercise ordinary care and was negligent." There is no set form for a converse instruction, Liebow v. Jones Store Company, Mo., 303 S.W.2d 660, 662, and it need not use the exact language of the instruction which it seeks to converse. Dell'Aria v. Bonfa, Mo., 307 S.W.2d 479. It thus appears that by its instruction B–6 Mo. P. & L. conversed plaintiff's instruction A–2 as to the odorization of the gas in the language which in two places plaintiff submitted that issue and also as plaintiff submitted it in the other place except for the addition of the erroneous provision pertaining to odorization so Otis Fields could detect it. In such situation plaintiff cannot complain that instruction A–2 was not complete in the respect contended.

■ As to the second reason for the challenge to instruction B–6, we are not able to understand the statement that it "merely tells the jury that if it finds that [Mo. P. & L.] * * * failed to odorize the said natural gas, then plaintiff is not entitled to recover." The complete answer to this contention is that the instruction did not do so.

■ The third reason that instruction B–6 only required that the gas be odorized at some distant point or some indefinite place, is without merit because the instruc-

tion referred to the odorization of "the said natural gas which flowed into plaintiff's room at said time." We must and do conclude that instruction B–6 is not prejudicially erroneous for any of the reasons assigned by plaintiff.

Plaintiff next challenges instruction B–4, submitting the issue of contributory negligence, because (1) it was "a misstatement of the law" and a "misdirection to the jury," (2) there was no substantial evidence to support the instruction, and (3) it failed to require a finding that the act of Otis Fields in striking the match "directly or proximately" contributed to cause his injuries. The contention of "misstatement" and "misdirection" is not further developed and we need not consider it further.

As to plaintiff's second contention, which is the only challenge to the instruction in the motion for new trial, he asserts that for the court to have been warranted in giving any type of an instruction on contributory negligence, there must be substantial evidence that the plaintiff had knowledge that the gas was leaking and that if he lighted a match there was danger of an explosion. Plaintiff testified that he was not inexperienced with natural gas, that it was in his home, and that he had received training concerning natural gas when in the military service.

He further testified that between 7:30 and 8:00 o'clock in the evening of October 11, about three hours before the explosion, he smelled a distinct and strong odor which he mistakenly identified as paint burning off the space heater, but that he was sufficiently concerned that he tested for escaping gas at the space heater. He also reported to his landlord that he had smelled an odor and had checked for escaping gas. When he returned to his room at 11:00 o'clock, a few minutes before the explosion, he noticed the odor was still present, but said it was then faint. However, at that time another tenant smelled an odor which he identified as the odor of natural gas.

■ Plaintiff relies on two cases, Nomath Hotel Co. v. Kansas City Gas Co., Mo., 300 Mo. 240, 253 S.W. 975, and Christie v. Gas Service Company, Mo., 347 S.W.2d 135. In each of these cases the question for decision was whether the plaintiff was guilty of contributory negligence as a matter of law, a contention not made in this case. We think the evidence warranted submitting to the jury the issue of contributory negligence on the part of Otis Fields in striking a match when he knew or should have known of the presence of escaping gas. See for example, Slates v. Joplin Butane Gas Co., Inc., Mo., 315 S.W.2d 808; Shaffer v. Sunray Mid-Continent Oil Company, Mo., 336 S.W.2d 102; Northwestern Ohio Natural Gas Co. v. First Congregational Church of Toledo, 126 Ohio St. 140, 184 N.E. 512; Hohnemann v. Pacific Gas & Electric Co., 35 Cal.App.2d 597, 96 P.2d 350, and the cases cited in the annotation at 26 A.L.R.2d at p. 189.

■ Mo. P. & L. submits two reasons, each of which we think to be sufficient, why a ruling on the merits of the third reason for plaintiff's challenge to instruction B–4 is not appropriate. By instruction B–4 the jury was told that if it found that Otis Fields was contributorily negligent in the respects submitted "your verdict must be for the defendants [that is, all of them] and against the plaintiff Otis Fields." The jury necessarily found that Otis Fields was not contributorily negligent because it returned a verdict in favor of plaintiff and against one of the defendants. Otis Fields could not have been not guilty of contributory negligence as to Elmore Turner, and contributorily negligent as to the other defendants. Therefore, the jury necessarily rejected the submission that Otis Fields was contributorily negligent as to any defendant. For this reason the failure of the instruction to submit properly the alleged contributory negligence as "directly or proximately" contributing to cause his injuries, if such is the case, is immaterial and therefore not prejudicial to

plaintiff. See Robbins v. Robbins, Mo., 328 S.W.2d 552. In addition, this objection to instruction B–4 was not brought to the attention of the trial judge before submission of the instruction to the jury or in the motion for new trial, and for that reason the contention is not preserved for appellate review. Overton v. Tesson, Mo., 355 S.W.2d 909; O'Brien v. City of St. Louis, Mo., 355 S.W.2d 904; Sullivan v. Hanley, Mo. App., 347 S.W.2d 710. It was pointed out in O'Brien v. City of St. Louis, supra, that the sound and logical reason for this rule is that specific objections to instructions are to be presented to the trial court where the error, if any, can be corrected without the delay and expense of an appeal. If they are not so presented the party is deemed to have waived them. This is not to say that instruction B–4 would upon review of the merits of the contention be held to be erroneous. We are not called upon to determine that question.

Plaintiff's last assignment of error is that the verdict of the jury (1) "was inconsistent," (2) was a result of "confusion and misconception of the issues," and (3) was "the result of bias and prejudice on the part of the jury against the plaintiff and in favor of the defendant, Missouri Power & Light Company, and the defendants, Beckers and Evers." No reason is advanced concerning the claim of confusion and misconception except as might be inferred from the alleged inconsistent feature of the verdict.

Plaintiff asserts that the verdict was inconsistent because in finding that Mo. P. & L. was not negligent "the jury necessarily determined that the meter was left sealed and turned off," and in finding in favor of Becker & Evers "the jury had to find that the meter was unsealed, and that * * * Luecke did not turn on the gas at a sealed meter."

In instruction A–1 plaintiff submitted as negligence on the part of Mo. P. & L. that at the time it "installed the meter the lock-wing cock controlling the flow of gas through said meter was not sealed." As bearing on the previous assignment of error pertaining to the language of the instruction on contributory negligence, plaintiff's assertion on this point that the jury necessarily determined that the meter was left sealed, necessarily calls for an admission that the jury found in favor of plaintiff on the issue of contributory negligence. Otherwise, the jury could have reached the verdict it did by finding that the meter was not sealed but that plaintiff was contributorily negligent. In the discussion of this point we accept as a fact as plaintiff now asserts that the jury resolved that Cecil Horn left the lock-wing cock sealed. Plaintiff's instruction, A–3, submitting negligence on the part of Becker & Evers, authorized a verdict for plaintiff if the jury found, among other things that Luecke (1) installed and put into operation a gas heater in the hall of the second floor of the building, and (2) connected the heater to a gas pipe which was a part of a system of gas pipes to which was also connected an uncapped pipe, and (3) after connecting said heater Luecke "turned the gas on at the meter causing the gas to flow through said system of pipes and through the uncapped pipe in plaintiff's room," and (4) in the exercise of ordinary care could have discovered the escape of gas. It is thus obvious and readily apparent that in making its finding in favor of Becker & Evers under instruction A–3 the jury did not necessarily determine that the meter was or was not sealed, nor did it necessarily determine that Luecke "did not turn on the gas at a sealed meter." Therefore, we cannot say that the verdict in this case was inconsistent.

The contention concerning "bias and prejudice" is, as stated in plaintiff's brief, based on the alleged "sympathy and prejudice in favor of the defendant, Becker, who suffered a seizure during the course of said trial while he was in the act of testifying, necessitating him being removed from the courtroom." We should first note that the transcript does not disclose such an

occurrence. In any event plaintiff makes no effort whatsoever to demonstrate it could have created or did create any sympathy for Mo. P. & L. or any bias and prejudice against plaintiff in his action against Mo. P. & L.

We turn now to the appeal by Becker & Evers from the order of the trial court granting plaintiff a new trial as to them. Plaintiff's case against Becker & Evers was submitted by instruction A–3, based on common law negligence, in that after Luecke, their agent, installed the space heater he "turned the gas on at the meter causing gas to flow through said system of pipes and through the uncapped pipe in plaintiff's room, and * * * said defendants in the exercise of ordinary care could have discovered the escape of gas through said uncapped line by either inspecting said system of pipes, or by listening to said meter or watching for movement of the dials thereon, * * *." On this submission the jury returned a verdict for Becker & Evers. The trial court granted plaintiff a new trial as to Becker & Evers on the ground that it erred in giving instruction C–2 and refusing instruction A–10. A preliminary statement concerning the background of these two instructions is required.

Section 393.140 RSMo 1959, V.A.M.S., provides that the Missouri Public Service Commission (hereafter referred to as the Commission) shall have the power to require every gas corporation subject to its jurisdiction, of which Mo. P. & L. admittedly is one, "to file with the commission and to print and keep open to public inspection schedules showing all rates and charges made, established or enforced or to be charged or enforced, all forms of contract or agreement and rules and regulations relating to rates, charges or service used or to be used, and all general privileges and facilities granted or allowed by such gas corporation, * * *." Pursuant to this statute and the requirements of the Commission, Mo. P. & L. filed its rules and regulations with the Commission, including

Rule VIIC, effective April 4, 1930 and thereafter unchanged, which provides as follows: "Gas shall be turned on only by an authorized agent of the company. The company may refuse to turn on gas if it is known, or if it is found that customer's piping or appliances are in an unsafe and dangerous condition, and service will not be turned on until such conditions are remedied." At the request of Becker & Evers the trial court gave instruction C–2 which told the jury that whether Becker & Evers are subject to Rule VIIC "is not being submitted to you, and during your deliberations you should not consider said Rule VIIC on any issue relating to defendants Becker & Evers." The trial court refused to give instruction A–10, requested by plaintiff which, after quoting Rule VIIC, told the jury if it found that on October 11, 1958, the agent of Becker & Evers "turned on the gas at the building owned by Elmore Turner * * * thereby causing natural gas to flow through the system of gas pipes on the second floor of said building, and through an uncapped pipe in a room occupied by plaintiff, Otis Fields, as a tenant, and if you find that said defendant, Becker & Evers, by so turning on said gas, violated Rule VIIC aforesaid, then you are warranted in finding said defendants guilty of negligence, and if you find that said defendants were thereby negligent, * * *." The result of instruction A–10, if it had been given, would have been to declare that, as a matter of law, a violation of Rule VIIC by Becker & Evers would constitute negligence on their part, and that the only question for determination by the jury would be the fact of injury and proximate cause. The basic and essential question thus presented is whether the violation of Rule VIIC by Becker & Evers creates a new cause of action in favor of plaintiff in addition to the cause of action based on common law negligence.

■ To give Rule VIIC the effect contended by plaintiff would be to give it the force of a legislative enactment. It has long been the rule in this, as well as in

other states, that the standard of care required of the ordinarily prudent man in specific circumstances may be prescribed by legislative enactment; either by way of statute or by municipal ordinance. Wells v. Henry W. Kuhs Realty Co., Mo., 269 S.W.2d 761, 47 A.L.R.2d 1038; Beezley v. Spiva, Mo., 313 S.W.2d 691; Dickerson v. St. Louis Public Service Company, 365 Mo. 738, 286 S.W.2d 820. The theory is that when a statute or ordinance provides that under certain circumstances particular acts shall or shall not be done, this fixes a standard of conduct for all members of the community from which it is negligence to deviate. Prosser on Torts, 2d ed. § 34. If Rule VIIC has such force and effect it is because it is in fact not only a rule of Mo. P. & L. but also a rule of the Commission applicable to the general public, including Becker & Evers, which has the force and effect of law, and the existence of which Becker & Evers as a member of the general public was charged with constructive knowledge.

 Any company engaging in business with the public may prescribe "rules" to govern its dealings with its customers. That is a matter between the company and its customer, and in the event of a business transaction the substance of the "rule" may become a part of the contractual arrangement. However, in the situation where the company is a public utility the state through its regulating agency over public utilities retains the right to regulate the public utility's rules and regulations relating to rates, charges and service. The authority of the Commission, however, extends only to determine whether the rules and regulations of the public utility are unjust, unreasonable, unjustly discriminatory or unduly preferential or in anywise in violation of any provision of law, and in such event to determine and prescribe the just and reasonable acts and regulations to be done and observed by the public utility. Section 393.140(5) RSMo 1959, V.A.M.S. Once such rules and regulations are filed and approved, then the public utility is prohibited

by law from changing them without filing the new rule with the Commission, and it is also prohibited from extending "to any person or corporation * * * any privilege * * * except such as are regularly and uniformly extended to all persons and corporations under like circumstances." Section 393.140(11). The prohibition of the statute in these respects is directed to the public utility, not to the public generally. When Mo. P. & L. filed its rules and regulations with the Commission they did not become rules and regulations of that administrative agency. Even when pursuant to Section 393.140(5), supra, the Commission finds a rule of a public utility to be unreasonable and after a hearing, determines and prescribes what a reasonable rule should be, the rule so prescribed is still that of the public utility and not a rule of the Commission. We can only conclude that Rule VIIC was no more than a rule of Mo. P. & L. even though in the exercise of police power the state retains the right to regulate its provisions in certain respects. We know of no authority, and we are cited to none, whereby the violation by a third party of a rule of a private company can result in the creation of a cause of action in favor of another person separate and apart from an action based on common law negligence for the commission of those acts which amounted to a violation of the rule. As was said in Southern Ry. Co. v. Allen, 88 Ga.App. 435, 77 S.E.2d 277, 286, "The fact that only violations of general law, municipal ordinances, rules of the Public Service Commission, and the like are considered and held to be negligence per se is too well known to require citations. The violation of a private company rule is not such a violation, * * *."

It appears to be plaintiff's contention that Rule VIIC is a rule of the Commission, although for the reasons previously stated we hold that it is not. Assuming however, that by reason of the statutory requirement that the rule be filed with and approved by the Commission it acquires such status, we conclude that a violation

of it by Becker & Evers would not result in creating a new and separate cause of action against Becker & Evers in favor of plaintiff. Becker & Evers are not a public utility and are not subject to the jurisdiction of the Commission. They are a part of the general public. Before Rule VIIC could apply to them, and before they could be charged with constructive knowledge of its existence, it would have to be a rule of general application to the public at large. However, before any rule of general application and future effect issued by an administrative agency, including the Commission, can have any legal effect whatever it must be filed in the office of the Secretary of State of Missouri. Art. IV, Sec. 16, Constitution of Missouri, V.A.M.S.; Sections 536.010 and 536.020 RSMo 1959, V.A.M.S. It is conceded that Rule VIIC has never been so filed. Therefore, while we consider Rule VIIC to be no more than a rule of Mo. P. & L. and not of the Public Service Commission, if it be contended otherwise it would impose no duty on Becker & Evers unless it is a rule of general application. But if it is such a rule it has no legal effect because it has never been filed with the Secretary of State.

Plaintiff relies primarily on State ex rel. St. Louis County Gas Co. v. Public Service Commission of Missouri, 315 Mo. 312, 286 S.W. 84. In that case the rules and regulations of the St. Louis County Gas Co. on file with and approved by the Public Service Commission provided that a prospective customer pay $75 of the total cost of any extension of the company lines to establish service, with certain provisions, immaterial here, for possible reimbursement. Three residents of St. Louis County filed a complaint with the Public Service Commission contending the rule to be unreasonable and requesting that the Commission order the gas company to serve them without the payment of the $75. The Commission held the gas company's rule to be unreasonable "as applied to the facts of [that] case." This court stated that the "sole question" presented for decision was "whether the commission may in specific instances compel a gas corporation to make extensions and furnish service in violation of the rules relating to rates and charges which are on file with it and have its approval, express or implied, and which are applicable to the public as a whole." In the course of the opinion it was said that "A schedule of rates and charges filed and published in accordance with * * * [now Section 363.040] acquires the force and effect of law; and as such it is binding upon both the corporation filing it and the public which it serves," and also "upon the Public Service Commission as well." It was then held that the rules and regulations of the gas company as to extensions are integral parts of the company's schedule of rates and charges, and if unjust and unreasonable the Commission, after a hearing, may order the schedule modified, but that the Commission "cannot set them aside as to certain individuals and maintain them in force as to the public generally." We are in complete agreement with the result of that case, but it does not hold that the violation of such a rule of a public utility by a third person creates a separate cause of action for negligence. As frequently is true when general language such as that quoted above is used, it goes too far when an attempt is made to apply it to other unrelated factual situations. The reason the schedule of rates and charges of a public utility filed with and approved by the Commission may be said, in the form of a generality, to acquire "the force and effect of law" is that the statute provides that the public utility cannot serve anyone except according to that schedule of rates and charges. The schedule is binding upon the public generally only in the sense that under the law the public utility is prohibited from permitting any member of the public to receive service contrary thereto. The rule does not acquire the force and effect of law in that it imposes a duty on members of the general public and charges them with constructive knowledge of the existence of the rule.

We necessarily conclude that in this case the violation by Becker & Evers of Rule VIIC of Mo. P. & L. could not impose on them liability for negligence in favor of plaintiff except on the basis that the acts which allegedly amounted to the violation of Rule VIIC would result in common law negligence. That issue was submitted to the jury, and on that submission it found against plaintiff. For the above reasons the trial court erred in granting plaintiff a new trial for the reasons set forth in its order.

Plaintiff contends that a new trial as to Becker & Evers should have been granted because the trial court erred in giving at the request of Becker & Evers instruction C-3 as follows: "The court instructs the jury that the defendants Becker and Evers are not required to prove that they were not negligent; but, on the other hand, plaintiff is required to prove by the greater weight of the credible evidence, that defendants Becker & Evers were negligent, as defined in other instructions. If plaintiff has failed to so prove negligence of the defendants Becker and Evers your verdict must be for defendants Becker and Evers."

Plaintiff asserts that this instruction is erroneous because "it confused and misled the jury as to the burden of proof required of plaintiff," and his specific objection is that an average juror would understand it to mean that plaintiff had to prove by his own evidence only that Becker & Evers was negligent. Plaintiff relies on Chaar v. McLoon, 304 Mo. 238, 263 S.W. 174. There a burden of proof instruction was held to be misleading, and therefore erroneous, because it told the jury that " 'The evidence for plaintiffs must outweigh that for defendant,' " and that if the jury was "unable to decide whether plaintiffs' evidence preponderates" or if the jury found that "the evidence for plaintiffs and evidence for the defendant are equally balanced, then it is your duty to find the issues for defendant." The court held that the above language "would strongly tend to exclude * * *

from consideration by the jury" the evidence favorable to plaintiffs which came from defendant's witnesses.

Our first comment is this. Neither in the point nor in the argument does plaintiff attempt to show that there was any evidence whatever pertaining to the alleged negligence of Becker & Evers which was favorable to him that did not come from the testimony of his own witnesses. The only testimony as to what Luecke, the agent of Becker & Evers, actually did or did not do came from Turner and from Luecke, both of whom were called as witnesses by plaintiff. In the Chaar case, cited and relied on by plaintiff, it is specifically pointed out that "much evidence favorable to [plaintiffs'] recovery came from [defendant's] witnesses."

Our second comment is that we do not consider the instruction as worded to be erroneous. It states that "plaintiff is required to prove by the greater weight of the credible evidence, that defendants Becker and Evers were negligent, as defined in other instructions." This does not refer to the evidence of any party, but to all the evidence. The "other instructions" necessarily were those of plaintiff, and if plaintiff did not there make it plain that he was entitled to have the jury consider all of the credible evidence he cannot now complain that Becker & Evers referred to them. The instruction then states that "If plaintiff has failed to so prove negligence * · * *." The words "so prove" refer to the means of proof, that is, by "the greater weight of the credible evidence," and to the proof of negligence as defined in "other instructions." We think no reasonably intelligent jury could have been caused by instruction C-3 to believe that it could look only to the evidence offered by plaintiff to determine the issue of negligence on the part of Becker & Evers. Apparently the trial judge came to the same conclusion because he refused to assign the giving of this instruction as a reason for granting a new trial. This court has repeatedly said that when an instruction is not er-

roneous but does not present an issue as clearly or succinctly as a party thinks it should, he must call the matter to the attention of the trial judge by requesting a clarifying or amplifying instruction. Thurman v. St. Louis Public Service Company, Mo., 308 S.W.2d 680, 687. We will concede that instruction C-3 could have been worded more clearly, but it is not a misdirection and it is not erroneous. The time to obtain a better worded instruction is at the time of the trial; it is too late on appeal.

The judgment as to Mo. P. & L. is affirmed. The order granting a new trial to plaintiff against Becker & Evers is set aside and the cause remanded with directions to reinstate the verdict and judgment in favor of Becker & Evers.

BARRETT and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.