Daniel WURST, Plaintiff/Appellant,

v.

NATIONAL OIL & SUPPLY CO., INC., Cal–Gas Corporation, and The Home Insurance Company, Defendants/Respondents.

No. 55651.

Missouri Court of Appeals,
Eastern District,
Southern Division.

Oct. 31, 1989.

Gregory K. Laughlin, Hillsboro, for plaintiff, appellant.

Richard K. Kuntze, Cape Girardeau, Kenneth L. Dement, Jr., Sikeston, Samuel C. Ebling, Philip E. Morgan, Jr., Jill I. Pilkenton, Clayton, for defendants, respondents.

GRIMM, Judge.

In this jury-tried case, plaintiff appeals from the trial court's order sustaining defendants' motions for judgment notwithstanding the verdict or in the alternative motions for new trial. We affirm.

Plaintiff raises six points of error. In his first three points, he alleges the trial court erred in sustaining each defendant's motion for judgment notwithstanding the verdict, because "there was substantial evidence and law supporting the jury's verdict...." We disagree, because plaintiff failed to make a submissible case against each defendant. Plaintiff's remaining three points allege trial court error in sustaining each defendant's motion for new trial. In light of our holding on plaintiff's first three points, we do not review those remaining points.

"When reviewing a judgment for defendant notwithstanding the verdict, the evidence is viewed in the light most favorable to the plaintiff and plaintiff is given the benefit of reasonable inferences to be drawn therefrom." *Dominick v. Sears, Roebuck & Co.,* 741 S.W.2d 290, 292–293 (Mo.App.E.D.1987). We review the evidence with those principles in mind.

In March, 1983, St. Francois County, Missouri, purchased a used gasoline storage tank. The tank was to be utilized to store road oil for the county highway department. It was fifteen feet long, ten feet six inches in diameter, and had a 10,000 gallon capacity. Since the tank was designed to stand vertically, its top was constructed of thinner metal than that used for the sidewalls. Thus, in the event of over-pressurization, the top would blow away.

In order to use the tank, the county made modifications to it. Modifications were needed because road oil is thick and

must be heated above approximately 95 degrees in order to transfer it from a storage tank into a distributor truck.

The county placed the tank horizontally on 8-feet high mountings. To enable the tank to be filled or emptied, the county cut a three-inch hole in the tank and installed a fitting. On the front of the tank, which was the tank's top when in a vertical position, the county installed two flues. These u-shaped flues, which were inside the tank, ran the length of the tank. The county attached two burners outside the tank; one to fire into each flue.

Cal-Gas Corporation supplied the propane gas for the two burners used in heating the storage tank. A Cal-Gas employee installed a propane gas tank at the site and ran a gas line to the burners. The employee also set and test fired the burners.

National Oil & Supply Co., Inc., supplied the county's road oil. National Oil's drivers made numerous deliveries of road oil to the county's storage tank.

The Home Insurance Company was the county's property and general liability insurer. At the underwriter's request, a Home Insurance employee conducted a loss control survey of the county's property on July 3, 1984. This included a survey of the county's maintenance facility. Following the survey, the Home Insurance employee prepared a report for the underwriter. The storage tank was not mentioned in the report.

Plaintiff was a County Highway Department employee. Approximately two months before July 27, 1984, he changed from working as a mechanic to driving a road oil distributor truck. On July 27, while preparing to transfer road oil from the storage tank to a county distributor truck, he turned on the burners for the storage tank. The oil in the storage tank, however, did not sufficiently cover the flues. This caused excess pressure to build inside the storage tank. Because the storage tank was inadequately ventilated, an explosion and fire resulted. Plaintiff suffered a dislocated hip and burns over a large portion of his body.

The jury returned a verdict awarding plaintiff damages. It assessed fault as follows: 30% to National Oil, 15% to Cal-Gas, 35% to Home Insurance, and 20% to plaintiff.

The trial court, however, sustained defendants' motions for j.n.o.v. The court found that plaintiff "failed to produce substantial evidence entitling him to recover from Defendants ... under any theory pleaded by the Plaintiff or under any theory recognized at law." The trial court conditionally sustained defendants' motions for new trial because the verdict was against the weight of the evidence, and because of instructional errors.

## I. Cal-Gas

In his first point, plaintiff contends the trial court erred in sustaining Cal-Gas's motion for j.n.o.v. Plaintiff alleges, "there was substantial evidence and law supporting the jury's verdict that Cal-Gas had notice of defects in the oil storage tank, that Cal-Gas inadequately and negligently inspected such tank and as a result [plaintiff] was injured...."

The elements of a negligence claim are duty, breach of duty, and causation. *Virginia D. v. Madesco Inv. Corp.*, 648 S.W.2d 881, 886 (Mo.banc 1983). In support of his theory that Cal-Gas had a duty to inspect the oil storage tank, plaintiff relies on *Fields v. Missouri Power & Light Co.*, 374 S.W.2d 17 (Mo.Div.2 1963).

The *Fields* court noted that "[a] supplier or distributor of natural gas ... is not an insurer as to injuries resulting from leaks or other defects in gas distributing systems not owned by it or under its control." *Id.* at 22. The court further noted, however, that "as a general rule [the supplier or distributor] may be guilty of negligence if a leak or other defect in the pipes or an appliance of a customer causes injuries to persons or property, provided the supplier or distributor has sufficient notice of such a leak or defect, and having such notice ... negligently inspects...." *Id.*

Plaintiff's reliance on *Fields* is misplaced. *Fields*, as well as the numerous cases it cites for the general rule, involved

injuries caused when gas escaped because of a leak or other defect in the customer's pipes or appliance. This general rule, therefore, imposes a duty on the gas supplier or distributor to adequately inspect gas distributing systems only when there is notice of a leak or other defect which allows gas to escape.

Unlike *Fields*, this is not an "escaping gas" case. Here, there was no evidence that there were leaks or other defects in the pipes, burners, or storage tank through which propane gas escaped. Rather, plaintiff's evidence was that the explosion and fire were a result of inadequate ventilation of the oil storage tank, a lack of gauges on the tank, and other defects which permitted the storage tank to be heated when the oil was below the flues.

*Fields* recognizes that a supplier or distributor of gas, such as Cal–Gas, may have a duty to inspect the pipes or the appliance to be connected to the pipe for escaping gas. *Fields* does not, however, place a duty on the supplier or distributor to otherwise inspect the appliance. Cal–Gas had no duty to inspect the oil storage tank for defects unrelated to escaping propane gas. *Fields* is not applicable.

Plaintiff further contends that the deposition testimony of Cal–Gas's local manager showed that Cal–Gas "knew it had a duty." The local manager was asked if he considered it part of his job "to inspect the customer's equipment to make sure it's safe to use ... propane." He responded, "Certainly." "Proof of custom," plaintiff asserts, "is relevant and admissible as evidence of the Defendants' duty of care." We disagree. Evidence of custom and usage is admissible, however, it "does not establish a standard of conduct or a defendant's duty to a plaintiff." *First Nat'l Bank of Sikeston v. Goodnight*, 721 S.W.2d 122, 126 (Mo.App.S.D.1986); *see also Broadview Leasing Co. v. Cape Central Airways, Inc.*, 539 S.W.2d 553, 562–563 (Mo.App.E.D.1976); 2 WIGMORE, EVIDENCE § 461 (Chadbourn rev. 1979).

Finally, plaintiff asserts Cal–Gas's "duty is supported by one of the most elementary principals [sic] of tort law: Every person has a duty to avoid creating situations which pose [an] unreasonable risk of harm to others." He asks us to hold that Cal–Gas was required to inspect the storage tank for defects merely because that tank was heated by a propane gas burner which Cal–Gas connected to its propane tank, test fired, and adjusted. Such a requirement would, in effect, make Cal–Gas an insurer of the storage tank's safety.

Cal–Gas was responsible for the safe delivery of propane gas to the county's burners. Cal–Gas did not assume responsibility for inspecting the storage tank. Plaintiff presented no evidence that Cal–Gas's employees had expertise or special training with regard to the proper design, construction, ventilation, and guaging of various oil storage tanks. Cal–Gas, as part of its routine propane installation, had no duty as a matter of law to inspect the county's oil storage tank for defects unrelated to escaping propane gas. Point denied.

## II. National Oil

■ Plaintiff's second point alleges that the trial court erred in sustaining National Oil's motion for j.n.o.v. Again, plaintiff asserts, "there was substantial evidence and law supporting the jury's verdict...."

Plaintiff's theory was that National Oil "failed to instruct adequately its drivers to recognize whether tanks into which it deposited its products could safely handle those products...." He asserts, "National Oil recognized that it had a duty to make sure a tank could safely handle its products before depositing those products in it, as is shown by its 'Driver's Guidelines.'"

Plaintiff misreads the guideline. Specifically, the guideline stated: "Make sure that the storage tank will handle the product before unloading." This guideline did not create a duty on National Oil to instruct its drivers to determine whether the county's storage tank was designed to safely heat the road oil. Rather, as a National Oil driver explained on direct examination by plaintiff's counsel, this guideline instructed drivers to "make sure [the stor-

age tank] was empty enough to hold your load."

National Oil was responsible for safely transferring road oil from its delivery trucks to the county's storage tank. However, under the facts of this case, National Oil had no duty, as a matter of law, to inspect the storage tank for defects in its design, construction, ventilation, and guaging. Thus, National Oil had no duty to instruct its drivers to conduct such inspections. Point denied.

### III. Home Insurance

■ Plaintiff's third point alleges that the trial court erred in sustaining Home Insurance's motion for j.n.o.v., because "there was substantial evidence and law supporting the jury's verdict...."

In 1984, Home Insurance was the county's property and general liability insurer. Less than one month prior to the explosion of the storage tank, Home Insurance conducted a loss control survey of the county's maintenance facility for the insurance company's underwriting department. The survey assessed the risk of fire damage to the maintenance buildings and the potential for members of the general public to get access to the facility and thereafter suffer injury while on county property.

Since the survey report completed by a Home Insurance employee made no mention of the storage tank, plaintiff alleged Home Insurance failed to exercise reasonable care in its inspection. Plaintiff's theory was based on the Restatement (Second) of Torts, § 324(A).

Section 324(A) provides in pertinent part: One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm,....

Citing *Brown v. Michigan Millers Mut. Ins. Co.*, 665 S.W.2d 630 (Mo.App.W.D.

1983), plaintiff asserts his theory under § 324(A) "is supported by the law of this State."

In *Brown*, employees of an independent contractor were badly injured and burned in an explosion at a grain mill. The explosion was the result of a buildup of static electricity in the plastic pipe used in the mill's conveyance system. The mill's insurance company had inspected the mill prior to the explosion. The insurance inspector, however, failed to identify the hazardous existence and use of the plastic pipe. Our colleagues in the Western District affirmed the jury's verdict finding the insurance company liable under § 324(A).

In reaching its decision, the *Brown* court factually distinguished its case from two Michigan cases, *Smith v. Allendale Mut. Ins. Co.*, 410 Mich. 685, 303 N.W.2d 702 (1981) and *Sabraw v. Michigan Millers Mut. Ins. Co.*, a companion case. The *Smith* opinion extensively discussed § 324(A), holding that:

"where a plaintiff seeks to prove an undertaking by conduct which benefits another and that conduct is consistent with a primary purpose on the part of the actor to benefit himself, the plaintiff must offer additional evidence to create a jury question whether there was an undertaking to render services and hence a duty to one who might foreseeably be injured by the actor's failure to perform the undertaking with reasonable care."

*Smith*, 303 N.W.2d at 712. This additional evidence "must show that the actor assumed an obligation or intended to render services for the benefit of another." *Id.* at 711–712. The Michigan Supreme Court held that the plaintiffs in *Smith* and *Sabraw* failed to show that the insurers undertook to render inspection services to the insureds. *Id.* at 712.

Applying the *Smith* analysis, the *Brown* court found sufficient facts in the record to demonstrate an undertaking on the part of the insurer to provide inspection services to the grain mill. *Brown*, 665 S.W.2d at 634. This evidence consisted of the insurer's advertisements and its letter to the insured offering insurance coverage. *Id.* at 633.

The advertisements stated that the insurer would inspect the insured's property and " 'offer suggestions that over the years have helped others avoid disastrous losses....' " The letter stated that an advantage of the insurance coverage was an " 'Inspection service provided to reduce hazards present in all grain handling plants.' "

Unlike *Brown*, the record in this case is devoid of any such evidence demonstrating Home Insurance's intent to benefit the county through its loss control surveys. There was testimony in the present case that following its loss control surveys, Home Insurance would customarily make recommendations for improvements to an insured. The loss control survey and recommendations undoubtedly benefited and assisted the county; because in seeking to contain its own losses, Home Insurance necessarily reduced the county's losses as well. *See Smith*, 303 N.W.2d at 713.

While Home Insurance's loss control survey benefited the county, it does not follow that Home Insurance undertook to render that service to benefit the county. *Id.* Unlike *Brown*, there is no evidence that Home Insurance agreed or intended to inspect the county's maintenance facility for other than Home Insurance's loss prevention and underwriting purposes.* *Id.*

Thus, plaintiff failed to make a submissible case against Home Insurance under § 324(A). Plaintiff's third point is denied.

We affirm the trial court's judgment sustaining defendants' motions for j.n.o.v.

CARL R. GAERTNER, P.J., and HAMILTON, J., concur.

---

\* Although it is not conclusive on the question of whether there was an undertaking, we note that the policy covering the county's property contained the following provision:

[Home Insurance] shall be permitted but not obligated to inspect [the county's] property and operations at any time. Neither [Home Insurance's] right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of [the county] or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule, or regulation.